2015 UT App 114

## THE UTAH COURT OF APPEALS

REBECCA KEYES,
Petitioner and Appellee,
*v.*
WARREN GENE KEYES,
Respondent and Appellant.

Opinion
No. 20130524-CA
Filed April 30, 2015

Second District Court, Ogden Department
The Honorable Michael D. DiReda
No. 084901373

Charles R. Ahlstrom, Attorney for Appellant

Randall W. Richards, Attorney for Appellee

JUDGE STEPHEN L. ROTH authored this Opinion, in which JUDGE J.
FREDERIC VOROS JR. concurred. JUDGE GREGORY K. ORME
concurred, with opinion.

ROTH, Judge:

¶1      Warren Gene Keyes (Husband) appeals from the divorce
decree dissolving his marriage to Rebecca Keyes (Wife).
Husband contends that the trial court erred in ruling that the
parties' premarital agreement was unenforceable. He also
contends that the court abused its discretion in awarding Wife
some of his separate property without providing detailed factual
findings to support that decision. Finally, Husband challenges
the alimony award to Wife. We reverse and remand.

BACKGROUND

Premarital Agreement

¶2 The parties acquired relatively few assets during their seventeen-year marriage, but each brought some assets to the marriage, most significantly Husband's interest in his family's landscaping business. Before they married, Husband and Wife executed a premarital agreement (the Agreement). The Agreement provides, in pertinent part, that each party

> shall have, keep and retain sole ownership, control and enjoyment of during [his or her] life, and by last will and testament or other testamentary disposition, shall have the exclusive right to dispose of any and all . . . real and personal property that [he or she] now owns or is possessed of.

Each party expressly "waive[d] all . . . right, title and interest to which [he or she] is or may be entitled in and to any of [the] real and personal property listed in" two attached exhibits, one for each spouse. Husband's exhibit listed "[a]ny proceeds from the [landscaping] business . . . and/or any other related business, investments, stocks, bonds and/or real property what so ever, including any increase in value of said business." The Agreement further provides that "this agreement is entered into whether or not the parties hereto have full knowledge of the extent and probable value of the real and personal property referred to in the [attached exhibits]."

¶3 The trial court ultimately concluded that the Agreement was unenforceable. Relying on a provision of Utah's Uniform Premarital Agreement Act that governs enforcement of premarital agreements (the Premarital Agreement Statute), the court concluded that Wife had "met her burden in establishing that fraud had been committed" because Husband had failed to disclose his financial information to Wife before she had executed the Agreement, Wife had not waived disclosure of that

information, and Wife could not have independently acquired knowledge regarding Husband's financial information prior to executing the Agreement. *See* Utah Code Ann. § 30-8-6(1)(b) (LexisNexis 2013).[1]

## Inventory

¶4    Because the trial court determined that the Agreement was unenforceable, it then went on to address the distribution of property. On appeal, Husband's only challenge to that distribution order relates to the award to Wife of one-half the value of his interest in his business's inventory.

¶5    About the time the couple married, Wife helped Husband acquire some storage racks for the landscaping business's warehouse. These storage racks allowed Husband's business to acquire substantially more inventory. Wife also testified that she encouraged Husband to diversify his inventory to attract more customers, which he did with some success. The trial court found that because this inventory was acquired "during the course of the marriage," it was marital property. Thus, the court awarded Wife one-half of the value of Husband's interest in the inventory, or $115,266.

## Alimony

¶6    Husband and Wife were both employed throughout the marriage. Husband worked exclusively for his family's landscaping business, in which he held a 50% ownership interest. Husband testified that he earned $1,400 a month in salary. But after hearing from the business's accountant about additional "distributions and guaranteed payments" to the

---

1. We cite the current codification of the Premarital Agreement Statute because the statute has not been amended since its enactment in 1994 and thus was in effect in its current form when the parties executed the Agreement in 1995.

owners, the trial court became concerned that Husband's reported income was "inaccurate" and "not support[ed] by his own testimony, by the testimony of his accountant, and by [the] exhibits." Accordingly, the court ordered "that a forensic accountant be brought into this case for the purpose of digesting [the] tax documents and helping [the court] to better ascertain the income of [Husband]." After hearing the forensic accountant's testimony, the court calculated Husband's monthly income to be $2,627.

¶7     Throughout the marriage, Wife worked full time in retail as a merchandiser and interior designer. She earned as much as $1,750 per month, which, based on a forty-hour work week, is about $10 per hour. Shortly before Wife filed for divorce, however, she was terminated from her employment. Between the time she filed for divorce and trial, Wife worked for two different employers, earning as much as $11.75 per hour. In both jobs, there was limited work available due to a slow economy. Wife also testified that she could only work three to four hours at a time due a decline in her health. In the months leading up to trial, Wife's gross monthly income was about $722. The trial court, however, found that Wife was currently unemployed but was capable of working full time at minimum wage to earn $1,257 per month.

¶8     The trial court also considered the parties' monthly expenses relative to their incomes. It determined that Wife had reasonable monthly expenses of $4,799[2] and that after deducting taxes from her gross monthly income of $1,257, she had a shortfall of $3,856. The court accepted Husband's representation that he had $1,923 in expenses each month. The court

2. Wife incurred some of these expenses for medical bills because Husband had allowed her health insurance to lapse, despite a previous court order that he provide insurance, and because Wife had been unable to acquire new insurance due to her preexisting condition.

determined that after deducting taxes and Husband's expenses from his gross income of $2,627, Husband had "a monthly surplus of $47." Therefore, although the surplus was "barely identifiable," Husband had some means to "assist [Wife]." Because the parties had more expenses than income, the court found it "appropriate that the parties share in the financial misery." Accordingly, it ordered Husband to pay Wife $1,928 per month in alimony for a time period equal to the marriage, subject to the usual contingencies of remarriage, cohabitation, or death. The court explained that its alimony award equalized the parties' standards of living by leaving each party "with a monthly shortfall of approximately $1928."[3]

¶9     Husband now appeals the trial court's decision on the enforceability of the Agreement as to the inventory and, in the event that the trial court's decision that the Agreement is unenforceable is upheld, the decision to award inventory itself. Husband also challenges the alimony award.

ISSUES AND STANDARDS OF REVIEW

¶10    Husband appeals from the trial court's decision not to enforce the Agreement. Husband challenges the court's interpretation of the Premarital Agreement Statute. We review the trial court's interpretation of a statute as a matter of law for correctness. *Daniels v. Gamma W. Brachytherapy, LLC*, 2009 UT 66, ¶ 46, 221 P.3d 256.

¶11    Husband contests the trial court's award to Wife of one-half of the value of Husband's share of the business inventory. Specifically, Husband contends that the trial court clearly erred in finding that the business inventory was marital property.

---

3. Wife's monthly deficit after receiving alimony was exactly $1,928, while Husband was left with a monthly deficit of $1,881 after paying alimony.

"Trial courts have considerable discretion in determining . . . property distribution in divorce cases, and will be upheld on appeal unless a clear and prejudicial abuse of discretion is demonstrated." *Stonehocker v. Stonehocker*, 2008 UT App 11, ¶ 8, 176 P.3d 476 (omission in original) (citation and internal quotation marks omitted). The decision, however, must be supported by adequate findings that "reveal how the court reached its conclusions." *Rappleye v. Rappleye*, 855 P.2d 260, 263 (Utah Ct. App. 1993). We review the legal adequacy of the trial court's findings for correctness. *Wall v. Wall*, 2007 UT App 61, ¶ 17, 157 P.3d 341.

¶12 Husband also challenges the trial court's alimony award. "We review a trial court's award of alimony for abuse of discretion. We will not disturb the trial court's alimony award so long as the trial court exercises its discretion within the standards set by the appellate courts." *Bakanowski v. Bakanowski*, 2003 UT App 357, ¶ 7, 80 P.3d 153 (citations and internal quotation marks omitted). To the extent that Husband has also challenged the sufficiency of the evidence to support the court's factual findings, we will not disturb the court's findings "unless they are clearly erroneous." *Kimball v. Kimball*, 2009 UT App 233, ¶ 14, 217 P.3d 733 (citation and internal quotation marks omitted).

ANALYSIS

I. The Agreement

¶13 Husband contends that the trial court erred when it determined that the Agreement was unenforceable. "Parties to a premarital agreement may contract with respect to . . . the rights and obligations of each of the parties in any of the property of either or both of them whenever and wherever acquired or located . . . [and] the disposition of property upon separation[ or] marital dissolution." Utah Code Ann. § 30-8-4(1)(a), (c) (LexisNexis 2013). Generally, a premarital agreement is enforceable in the same manner as any other contract. *Levin v.*

*Carlton*, 2009 UT App 170, ¶ 15, 213 P.3d 884. However, the Premarital Agreement Statute prohibits enforcement if

> the agreement was fraudulent when executed *and*, before execution of that agreement, [the] party [against whom enforcement is sought]:
>
> > (i) was not provided a reasonable disclosure of the property or financial obligations of the other party insofar as was possible;
> >
> > (ii) did not voluntarily and expressly waive, in writing, any right to disclosure of the property or financial obligations of the other party beyond the disclosure provided; and
> >
> > (iii) did not have, or reasonably could not have had, an adequate knowledge of the property or financial obligations of the other party.

Utah Code Ann. § 30-8-6(1)(b) (emphasis added).

¶14 The statute's prohibition on enforcement of premarital agreements under these circumstances seems to be an outgrowth of our case law's long recognition that "'[p]remarital agreements concerning the disposition of property owned by the parties at the time of their marriage are valid so long as there is no fraud, coercion, or material nondisclosure.'" *Reese v. Reese*, 1999 UT 75, ¶ 24, 948 P.2d 987 (quoting *Beesley v. Harris* (*In re Estate of Beesley*), 883 P.2d 1343, 1347 (Utah 1994), which observed that this principle had previously been noted in dicta). Indeed, when considering the validity of premarital agreements, our courts have always required that prospective spouses be "held to the highest degree of good faith, honesty, and candor in connection with the negotiation and execution of [a premarital] agreement[]." *In re Estate of Beesley*, 883 P.2d at 1346. This heightened duty between spouses arises because

> [u]nlike a party negotiating at arm's length, who generally will view any proposal with a degree of

> skepticism, a party to a premarital agreement is much less likely to critically examine representations made by the other party. The mutual trust between the parties raises an expectation that each party will act in the other's best interest.

*Id.* "Thus, the general principle derived from our case law is that spouses or prospective spouses may make binding contracts with each other and arrange their affairs as they see fit, insofar as the negotiations are conducted in good faith, as described in *In re* [*Estate of*] *Beesley . . . ."* *Reese*, 1999 UT 75, ¶ 25.

¶15 In this case, the parties entered into a premarital agreement that provided that Wife "waives all of her right, title and interest to which she is or may be entitled in" Husband's "business . . . and/or any other related business, investments, stocks, bonds and/or real property what so ever, including any increase in value of said business." The trial court determined that this Agreement was not enforceable because Wife "met her burden in establishing . . . fraud" when she demonstrated that "no reasonable disclosure [of the business's value or debts] occurred," Wife "never voluntarily or expressly issued a waiver to the financial disclosure," and Wife "had no knowledge as to the worth of the business."

¶16 On appeal, Husband argues that the trial court's conclusion that the Agreement was unenforceable "was wrong, unsupported as a matter of law" for two reasons. First, he contends that the court "did not address the primary and mandatory factor that the Agreement . . . be fraudulent." Rather, the court simply determined that the three subsidiary conditions had occurred and that fulfillment of those conditions itself established that the Agreement was fraudulently executed. Second, he contends that the court erred in determining that each of the three subsidiary conditions for invalidating the Agreement had been satisfied because Wife waived her right to additional disclosure. As we will discuss below, Husband's first

contention is well taken, but his second contention was not preserved.

A. The Trial Court Failed To Make an Independent Determination of Fraud.

¶17 The trial court erred when it read the Premarital Agreement Statute to mean that its threshold requirement—that the Agreement be fraudulently executed—was satisfied once each of the three subsidiary conditions had been demonstrated. In other words, the court read the statute to mean that the absence of a reasonable disclosure of assets and liabilities by the spouse benefitted by a premarital agreement, combined with inadequate knowledge or opportunity to know and the lack of a voluntary and express waiver of asset and liability-related information on the part of the other spouse, would render the agreement fraudulent.

¶18 When interpreting statutes, appellate courts "seek to give effect to the intent of the legislature" by "interpret[ing] the statute according to its plain language." *Wilcox v. CSX Corp.*, 2003 UT 21, ¶ 8, 70 P.3d 85 (citation and internal quotation marks omitted). In doing so, we examine the language of the statute as a whole. *LPI Servs. v. McGee*, 2009 UT 41, ¶ 11, 215 P.3d 135.

¶19 The Premarital Agreement Statute separates the "fraudulent when executed" requirement and the three subsidiary conditions with the word "and." The use of the conjunctive "and" indicates that all four requirements—(1) fraudulent execution, (2) nondisclosure of financial obligations, (3) no express waiver of disclosure, and (4) no independent knowledge of the financial obligations—must occur to render a premarital agreement unenforceable. *See, e.g.*, *Gregerson v. Equitable Life & Cas. Ins. Co.*, 256 P.2d 566, 567 (Utah 1953) (stating, in the context of analyzing an insurance policy's conditions for reinstatement, that "[t]he use of the conjunctive 'and' indicates that the reinstatement depends upon the fulfillment of two requirements"). Yet the trial court did not make a separate finding of fraud but rather seemed to assume

that fraud had necessarily occurred simply because Wife had shown that the three subsidiary conditions were met.

¶20 Husband contends that although the trial court could find that he did not fully disclose his property and financial obligations to Wife, it could not have determined that his actions amounted to fraud had it conducted a proper fraud analysis rather than relying solely on consideration of the three subsidiary factors. "Fraud" is a "false representation of an existing material fact, made knowingly or recklessly for the purpose of inducing reliance thereon upon which the plaintiff reasonably relies to his detriment." *Atkinson v. IHC Hosps., Inc.*, 798 P.2d 733, 737 (Utah 1990) (citation and internal quotation marks omitted). The simple failure of one party to disclose property or financial obligations, of which the other party would not otherwise be aware, without the other party's voluntary and express waiver does not necessarily amount to a "false representation" of material information "made knowingly or recklessly for the purpose of inducing reliance." *See id.* (citation and internal quotation marks omitted). Nor does it necessarily mean that the other party "reasonably relie[d]" upon the nondisclosure "to his detriment." *See id.* (citation and internal quotation marks omitted).

¶21 Husband argued to the trial court that he did not "knowingly" misrepresent or conceal any information because he trusted that the attorney who prepared the Agreement "was handling the matter appropriately and legally" and that Wife was generally aware of his assets and debts. Husband also elicited testimony from Wife that at the time she entered the Agreement, she knew that Husband had not fully disclosed financial information to her about the family business and that even if he had, it would not have affected her decision in any way because "[she] loved him and [she] thought he was a really good guy." Thus, Husband claims that he demonstrated that even if he did knowingly withhold material information, Wife did not rely on his failure to disclose. Wife, on the other hand, testified that Husband had informed her that the business was bankrupt. She reported that she was therefore "surprised when

[Husband] asked for a prenuptial agreement" but that Husband told her not to worry.

¶22   In determining that there was necessarily fraud in the Agreement's execution because the three subsidiary conditions had been satisfied, the trial court left the parties' arguments unaddressed in this regard. And the satisfaction of the three subsidiary conditions does not require a fraud determination, though they certainly may be relevant to the issue. For that reason, we remand for the trial court to determine whether, under the totality of the circumstances, the Agreement was "fraudulent when executed." *See* Utah Code Ann. § 30-8-6(1)(b) (LexisNexis 2013).

B.      Husband Failed To Preserve His Waiver Argument.

¶23   Husband contends that even if the Agreement was fraudulent when executed, it is nevertheless enforceable under the statute because Wife executed a waiver of her right to receive any additional disclosures. The Premarital Agreement Statute precludes enforcement of a fraudulent premarital agreement only when three conditions have been demonstrated—the party against whom enforcement is sought (i) "was not provided a reasonable disclosure of the property or financial obligations," (ii) "did not voluntarily and expressly waive, in writing, any right to disclosure," and (iii) "did not have, or reasonably could not have had, an adequate knowledge of the property or financial obligations."[4] *Id.*

¶24   Husband argues that Wife's written waiver can be found in paragraph 10 of the Agreement, which states, "[T]his agreement is entered into whether or not the parties hereto have full knowledge of the extent and probable value of the real and personal property referred to in the" attached exhibits. However, Husband did not raise this waiver claim in the trial court, and it

---

4. Husband does not challenge the trial court's findings that conditions (i) and (iii) have been demonstrated.

is therefore unpreserved for our review. *See 438 Main St. v. Easy Heat, Inc.*, 2004 UT 72, ¶ 51, 99 P.3d 801 ("[I]n order to preserve an issue for appeal[,] the issue must be presented to the trial court in such a way that the trial court has an opportunity to rule on that issue." (alterations in original) (citation and internal quotation marks omitted)).

¶25   In his motion for summary judgment on Wife's claims for division of property, Husband did not assert that the Agreement was enforceable because Wife had waived any right to financial disclosure. Rather, his motion focused on the Agreement's enforceability despite his failure to disclose. Nor did Husband raise the issue at the trial court's hearing on the enforceability of the Agreement. In an attempt to "focus [Husband's examination of Wife] on the aspects of the statute" that were at issue, the judge stated, "I don't think there's been any indication that there's been a waiver unless I missed it under sub double 'i' [of the Premarital Agreement Statute]." Husband said nothing in response before returning to his examination of Wife, tacitly endorsing the court's understanding. Later, the judge posed a similar question to Wife and indicated that based on his discussion with Husband, he understood the statute's "triple 'i' [to be] really the only one that's at issue" because Wife had "never waived any disclosure." Wife confirmed the court's understanding, and Husband remained silent, again indicating his tacit approval. Because Husband never put the issue of waiver squarely before the court, even when invited to do so, he has failed to preserve the issue for appeal, and we will not consider it.

¶26   Accordingly, we remand solely for a determination of whether, under the circumstances surrounding Husband's failure to disclose, the Agreement was fraudulent when executed. If the court determines that the Agreement was not fraudulent, then it should enforce the Agreement to the extent it relates to the business inventory, the only issue that Husband claims is governed by the Agreement. If the court decides that the Agreement was fraudulent when executed or that the Agreement does not apply to the inventory, then it must make

adequate findings, as discussed in part II, to support its decision regarding the inventory's distribution.

## II. Inventory

¶27    Husband contends that the trial court "inappropriately awarded Wife a portion of the inventory held by Husband's business." We conclude that the court's findings regarding division of the inventory are legally inadequate.

¶28    In addressing the distribution of property between divorcing spouses, the trial court must first determine whether the assets in dispute are marital or separate property. *Dahl v. Dahl*, 2015 UT 23, ¶ 121, 345 P.3d 566. "Marital property is ordinarily all property acquired during the marriage . . . whenever obtained and from whatever source derived." *Dunn v. Dunn*, 802 P.2d 1314, 1317–18 (Utah Ct. App. 1990) (citation and internal quotation marks omitted). "In Utah, marital property is ordinarily divided equally between the divorcing spouses . . . ." *Stonehocker v. Stonehocker*, 2008 UT App 11, ¶ 13, 176 P.3d 476. After identifying property as marital, the court must "consider whether there are exceptional circumstances that overcome the general presumption that marital property be divided equally," "assign values to each item of marital property so that [a] distribution strategy . . . can be implemented," and "distribute the marital assets consistent with the distribution strategy." *Dahl*, 2015 UT 23, ¶ 121 (alteration and omission in original) (citation and internal quotation marks omitted). On the other hand, "separate property, which may include premarital assets, inheritances, or similar assets, will be awarded to the acquiring spouse." *Stonehocker*, 2008 UT App 11, ¶ 13 (citation and internal quotation marks omitted). In most cases, "equity requires that each party retain the separate property that he or she brought into the marriage, including any appreciation of the separate property." *Dunn*, 802 P.2d at 1320. Separate property may lose its separate character, however, "through commingling" or if "the other spouse has by his or her efforts or expense contributed to the enhancement, maintenance, or protection of that property." *Mortensen v. Mortensen*, 760 P.2d 304, 308 (Utah

1988). In making this assessment, the court "look[s] to a party's actions as a manifestation of a spouse's intent to contribute separate property to the marital estate." *Dahl*, 2015 UT 23, ¶ 143.

¶29 In general, we defer to a trial court's categorization and equitable distribution of separate property due to the considerable discretion it has in this area. *Stonehocker*, 2008 UT App 11, ¶ 8 (noting that a trial court's property distribution "will be upheld on appeal unless a clear and prejudicial abuse of discretion is demonstrated" (citation and internal quotation marks omitted)); *Rappleye v. Rappleye*, 855 P.2d 260, 263 (Utah Ct. App. 1993) (explaining that the trial court has primary responsibility for determining and assigning values to property). "However, there must be adequate factual findings to reveal how the court reached its conclusions," *Rappleye*, 855 P.2d at 263, and to "establish[] that the court's judgment or decree follows logically from, and is supported by, the evidence," *Dahl*, 2015 UT 23, ¶ 121 (citation and internal quotation marks omitted). The touchstone of adequate findings is that they are "sufficiently detailed and include enough subsidiary facts to disclose the steps by which the ultimate conclusion on each factual issue was reached." *Hall v. Hall*, 858 P.2d 1018, 1021 (Utah Ct. App. 1993) (citation and internal quotation marks omitted). Adequate findings of fact "enable 'meaningful appellate review'" because an appellate court can understand the trial court's reasoning and assess its compliance with governing law. *Neff v. Neff*, 2011 UT 6, ¶ 61, 247 P.3d 380 (quoting *Willey v. Willey*, 951 P.2d 226, 230 (Utah 1997)).

¶30 Here the trial court did not provide a sufficient basis for us to determine whether its decision regarding the nature and distribution of the inventory complied with governing law. Rather, the court simply found that "[t]he business did . . . acquire a large amount of inventory during the course of the marriage, which [inventory] has been valued at $461,064." It then concluded that Wife "is entitled to her marital percentage of that inventory, which is one-half [of Husband's interest]." In making this order, the court did not explain how Wife had obtained an interest in the business inventory, which Husband

had testified was purchased solely with proceeds from the landscaping business that the court had characterized as Husband's separate property. There is certainly some evidence in the record that might support an award of an interest in the inventory to Wife, including Wife's testimony about her contributions to the business's acquisition of the inventory and her belief that Husband was reinvesting money into the business that should properly have benefited the marriage, for example, by keeping his salary or distributions artificially low. But in the face of the court's finding that the landscaping business was separate property and the evidence that the inventory was purchased using business resources, we conclude that the court's findings lack sufficient detail and "enough subsidiary facts to disclose the steps by which the ultimate conclusion . . . was reached." *See Hall*, 858 P.2d at 1021 (citation and internal quotation marks omitted).

¶31　Thus, we conditionally remand for the trial court to further consider its decision to award Wife one-half of Husband's interest in the inventory. Our remand is conditional because the trial court's conclusion regarding fraud in the Agreement could render this particular claim moot. And if the court does reach the inventory issue on remand, the court may simply enter more detailed findings that adequately support its original decision regarding the marital nature of the inventory or it may find it appropriate to reconsider that decision. Nothing in this decision should be interpreted as expressing a view toward a particular result.

### III. Alimony

¶32　Husband also claims that the trial court abused its discretion in making the alimony award. Husband argues that the court's findings regarding Wife's financial condition and needs are not supported by the evidence. He also challenges the court's approach to equalizing the parties' income because it fails to take into account the disparities between his and Wife's

needs, leaving him with an inequitably disproportionate burden of the resulting hardship.[5]

¶33 To "support[] its [alimony] decision with adequate findings and conclusions," the trial court is obligated to consider the factors set forth in Utah Code section 30-3-5(8)(a). *Mark v. Mark*, 2009 UT App 374, ¶¶ 6, 9, 223 P.3d 476 (citation and internal quotation marks omitted). These factors include "(i) the financial condition and needs of the recipient spouse; (ii) the recipient's earning capacity or ability to produce income; (iii) the ability of the payor spouse to provide support; [and] (iv) the length of the marriage." *Id.* ¶ 9 (alteration in original) (citing Utah Code Ann. § 30-3-5(8)(a) (LexisNexis Supp. 2005)). The trial court "must make sufficiently detailed findings of fact on each [statutory] factor to enable a reviewing court to ensure that the trial court's discretionary determination was rationally based upon these . . . factors." *Id.* (omission in original) (citation and internal quotation marks omitted).

¶34 A party claiming that the court's findings are not supported by sufficient evidence must demonstrate that the findings are clearly erroneous. *Kimball v. Kimball*, 2009 UT App 233, ¶ 14, 217 P.3d 733. "A trial court's factual determinations are clearly erroneous only if they are in conflict with the clear weight of the evidence, or if this court has a definite and firm conviction that a mistake has been made." *Id.* (citation and internal quotation marks omitted). We conclude that the trial court's findings regarding Wife's ability to earn income "conflict with the clear weight of the evidence." *See id.* (citation and internal quotation marks omitted).

---

5. Husband briefed this issue primarily as a challenge to the adequacy of the trial court's findings, and Wife claimed that Husband had failed to preserve that argument. We consider the issue to actually be a legal challenge to the application of the equalization-of-income standard.

¶35 The trial court found that Wife "is currently unemployed, but capable of working a full-time job earning minimum wage" as a basis for its decision to "impute gross monthly income to [Wife] of $1257." The first phrase of the finding, that Wife "is currently unemployed," is contradicted by the evidence, as Wife testified at trial that she was working, albeit on a reduced schedule. It is also difficult to discern the basis on which the trial court arrived at an earning capacity for Wife of minimum wage, as it appears to be undisputed that Wife had earned more than minimum wage in her previous full-time jobs and was earning $11.75 an hour from part-time employment at the time of trial. But the court did not explain why it was imputing only minimum wage to her. *See* Utah Code Ann. § 78B-12-203(7)(b) (LexisNexis 2012) ("If income is imputed to a parent, the income shall be based upon employment potential and probable earnings as derived from employment opportunities, work history, occupation qualifications, and prevailing earnings for persons of similar backgrounds . . . ."); *cf. id.* § 78B-12-203(7)(c) ("If a parent has no recent work history or a parent's occupation is unknown, income shall be imputed at least at the federal minimum wage for a 40-hour work week.").[6]

¶36 The court also found that Wife was capable of working full time. But Wife testified that during the divorce proceedings, her health had seriously deteriorated and she was then physically unable to work more than three to four hours at a time and therefore could not work full time. Husband did not contest Wife's claim other than to suggest that she had been dealing with health issues for a number of years and that she had been able to find employment in the past where the employer could make suitable accommodations. Thus, the

_____

6. "Although the section of the Utah Code that addresses imputation is located in the Utah Child Support Act" and thus references a "parent" to whom income may be imputed, this section is "also relevant to imputation in the alimony context." *Busche v. Busche*, 2012 UT App 16, ¶ 15 n.7, 272 P.3d 748 (citation and internal quotation marks omitted).

finding that Wife is capable of working full time also does not appear to be supported by the record evidence. *See Kimball*, 2009 UT App 233, ¶ 14.

¶37     It is possible, of course, that the trial court simply disbelieved Wife's testimony about her inability to work full time or thought that Wife could find full-time employment that would make necessary accommodations. It is also possible that the court might have imputed income to Wife as it did—full-time work at minimum wage—in an attempt to take into account the complex interrelationship of Wife's history of full-time work at higher pay and the reality of her present inability to work more than part time (but at higher than minimum wage). But again such an approach is not apparent on the face of the court's decision and is not a result that is readily deduced from the record. *See id.* ¶ 13. Given the sparse analysis on the issue, we can only speculate that the court had reasons for its decision that it did not express when the uncontradicted evidence seems to belie the court's express finding that Wife is capable of working full time at minimum wage. *See Bakanowski v. Bakanowski*, 2003 UT App 357, ¶ 13, 80 P.3d 153 ("The findings of fact must show that the court's judgment or decree follows logically from, and is supported by, the evidence." (citation and internal quotation marks omitted)).

¶38     Moreover, the court's decision to equalize the parties' income in the face of their inability to meet their combined needs, while appropriately aimed at sharing the hardship of inadequate resources, does not seem to take into account the apparent effect of this approach on Husband's relative ability to meet basic needs. The decision thus raises an unaddressed concern about the equities of the resolution. *See Oliekan v. Oliekan*, 2006 UT App 405, ¶ 16, 147 P.3d 464 (stating, in the context of reviewing a property distribution, that we will disturb the trial court's decision when "there is a misunderstanding or misapplication of the law such that a manifest injustice or inequity results, indicating an abuse of discretion").

¶39 Equalization of income, which "is perhaps better described as 'equalization of poverty,'" is a trial court's remedy for "those situations in which one party does not earn enough to cover his or her demonstrated needs and the other party does not have the ability to pay enough to cover those needs." *Sellers v. Sellers*, 2010 UT App 393, ¶ 3, 246 P.3d 173. When this situation arises, the trial court must determine how to equitably allocate the burden of insufficient income that occurs when the resources that were sufficient to cover the expenses of a couple must now be stretched to accommodate the needs of two individuals living separately. Such a situation arose in this case where the parties had a combined $6,722 in monthly expenses that the trial court found reasonable and only $2,913 in net monthly income. The court attempted to equalize the parties' poverty by setting alimony at a rate whereby they would each be "left with a monthly shortfall of approximately $1928" between their incomes and their expenses. This is not an unreasonable approach at a theoretical level. *See generally Hansen v. Hansen*, 2014 UT App 96, ¶ 4, 325 P.3d 864 (noting that the trial court equalized the parties' standards of living by awarding alimony in a way that resulted in "each party having an equal monthly shortfall"); *Kidd v. Kidd*, 2014 UT App 26, ¶ 3, 321 P.3d 200 (noting that by "adding the parties' monthly income" and "dividing that income in half," then awarding the wife the difference between one-half the parties' total income and her individual income, the trial court "intended to ensure that the shortfall in their ability to maintain the marital standard of living was equitably shared").

¶40 As a practical matter, however, the trial court's approach appears to leave Husband without the ability to meet any of his most basic needs. The court accepted that Husband had reasonable monthly needs of $1,923, including approximately $1,400 in housing and food expenses, and had monthly net income of $1,970, $47 more than his needs. Because Husband had a surplus, albeit a meager one, the court concluded that he was able to pay alimony. But by awarding Wife $1,928 per month, leaving Husband with just $42 to put toward his basic needs, the court appears to have put Husband in a position

where he has insufficient means to sustain life on the most basic level. Wife, on the other hand, is to receive $2,871 from net imputed income and alimony. This figure falls far short of her accepted monthly needs of $4,799, but it is more than adequate to cover her basic expenses for food and shelter, which total roughly $1,400. It seems that "shared misery" income equalization is often based—at least in part—on a judge's determination that one party or both must (and can) tighten their belts in the face of clearly insufficient resources. But even assuming that the court could have determined that Husband's declared monthly expenses for housing and food were inflated, an allocation that on its face leaves one party with essentially no income for basic necessities cannot be deemed equitable without further explanation by the trial court.[7] *Cf. Jensen v. Jensen*, 2008 UT App 392, ¶ 13, 197 P.3d 117 (explaining that a goal of awarding alimony is to "equaliz[e] the parties' standards of living," which requires the court to take into account, "'all relevant facts and equitable principles'" (quoting Utah Code Ann. § 30-3-5(8)(c) (LexisNexis Supp. 2008))); *Bakanowski*, 2003 UT App 357, ¶ 10 (explaining that a trial court abuses its discretion when it fails to take into account the parties' needs and abilities to support themselves in making an alimony award). It seems clear that the court believed that Husband had understated his income when it decided that Husband's income exceeded his reported salary. But the amount the court calculated above what Husband reported is just the sum that now leaves him with only $42 after deducting the $1,928 monthly alimony award.

---

7. It is of course possible that divorcing parties will not have enough combined income to cover their combined basic needs. In such a case, the court may make an alimony award that will require both parties to reduce their budgets. Such an award is justifiable because it requires both spouses to share the daunting challenge of working out how to meet basic needs with inadequate resources. It is the apparent one-sidedness of the burden in this case that is problematic.

¶41   We have located no case that endorses the equalization of income and any resulting hardship in such a disparate manner. *See, e.g.*, *Hansen*, 2014 UT App 96, ¶¶ 3–4, 19 (affirming the trial court's equalization of the parties' monthly shortfalls where the husband had $1,345 to meet his monthly needs of $1,867 after paying alimony and the wife had $3,543 to meet her needs of $4,064); *Kidd*, 2014 UT App 26, ¶¶ 3, 27 (declining to disturb the trial court's equalization of income by ordering the husband to pay $2,182.50 in monthly alimony, which would leave the husband with $6,066.50 to meet his needs of $7,270 and the wife $3,742.50 to meet her needs of $6,078); *Child v. Child,* 2008 UT App 338, ¶ 7, 194 P.3d 205 (discerning no error in the trial court's alimony award of $2,575 to the wife, which would leave the husband with $2,575 to meet his alleged needs of $3,945 and the wife $5,214 to meet her alleged needs of $7,217), *vacated in part on other grounds*, 2009 UT 17, 206 P.3d 633 (per curiam). Therefore, we conclude that the trial court went too far in equalizing the income in the manner that it did, and we vacate the alimony award as facially inequitable.

¶42   One final note on this point: although the alimony award appears to burden Husband with a much more serious hardship than Wife, we recognize that the trial court had misgivings about Husband's report of his monthly earnings sufficient to warrant the appointment of an independent forensic accountant to address the issue. But while the court accepted an average of the previous three years' income to calculate Husband's current monthly income for alimony purposes, the court also concluded that Husband is likely to earn more income in the future. In addition, there is other evidence in the record, such as the fact that Husband was able to obtain "weekly spiff money," which was a cash allowance in addition to his salary, and may have had other potential sources of revenue aside from his income, to suggest that he may have some other means of support. Thus, we remand for the trial court to further consider the award of alimony. In doing so, the court may need to reconsider other aspects of its alimony decision, including Wife's earning capacity

and the parties' financial needs, and should not consider this remand order to either require or restrict it from doing so.[8]

CONCLUSION

¶43    We reverse the trial court's decision that the Agreement was not enforceable and remand for the court to make a separate conclusion regarding fraud, as required by the Premarital Agreement Statute. The trial court must then consider how its decision on the Agreement's enforceability affects its inventory decision. Should the court determine that the Agreement does not govern the inventory distribution, it must either enter detailed findings to support its decision to award half of the

---

8. Husband also challenges the trial court's findings regarding the length of the marriage and Wife's need for alimony. Regarding the length of marriage finding, Husband argues that "the court gave no indication as to why the length of the marriage was important or how that factor was considered." The court, however, is statutorily required to take into account the length of the marriage as part of its assessment of how long the alimony award should continue. *See* Utah Code Ann. § 30-3-5(8)(a)(iv), (j) (LexisNexis 2013). Husband also seems to be arguing that the court should have calculated the length of the marriage from the date of the parties' marriage to the date of their separation in 2008, rather than to the date of the divorce trial in 2012. Husband has not shown that he made that argument in the trial court in a way that would have required the court to include a more detailed finding about how it calculated the length of the marriage. *See 438 Main St. v. Easy Heat, Inc.*, 2004 UT 72, ¶ 51, 99 P.3d 801. Regarding Wife's need, Husband has failed to convince us—except to the extent that Wife's need is implicated in his challenge to the equalization analysis—that the court abused its discretion in accepting Wife's monthly expenses, as set out in her financial declaration. That said, the trial court is, of course, free to reassess these findings on remand as part of its reconsideration of the alimony award.

business inventory to Wife or reconsider that decision as the it sees appropriate. Regarding the alimony award, we remand for the trial court to reconsider the alimony award, taking into account the concerns raised by this decision. We emphasize, however, that nothing in this decision is meant to express an opinion as to the ultimate outcome of the issues addressed.

_____

ORME, Judge (concurring)

¶44 I was initially perplexed at all the attention given to the premarital agreement (the Agreement) in this case, thinking it was essentially a red herring. The Agreement is not one that, by its terms, purports to do anything terribly drastic, at least as concerns property distribution. On the contrary, it provides for nothing more radical than what the law already prescribes: The parties will each retain their own separate property. Even without a premarital agreement, the property Husband owned at the time of marriage is his separate property, consistent with the usual rule that the property each spouse brought to the marriage remains their separate property. *See Rappleye v. Rappleye*, 855 P.2d 260, 263 (Utah Ct. App. 1993) ("As a general rule, premarital property is considered separate property and will be retained by the party who brought it into the marriage.").

¶45 But if the Agreement is enforceable, it may well be that it precludes the application of the narrow exception to the general rule, i.e., that in adjusting the rights of the parties the trial court is empowered to distribute the separate property of divorcing spouses in some way other than solely to the owner, if equity so requires. *Haumont v. Haumont*, 793 P.2d 421, 424 n.1 (Utah Ct. App. 1990) ("[T]he trial court may, in the exercise of its broad discretion, divide the property equitably, regardless of its source or time of acquisition."). *See Burt v. Burt*, 799 P.2d 1166, 1169 (Utah Ct. App. 1990) (explaining that separate property is not "totally beyond the court's reach in an equitable property division"). Absent the Agreement, equity would permit the court to direct some of Husband's separate property to Wife if, for example, it

determined Wife played a significant role in the enhancement of its value or to make her whole from Husband's claimed dissipation of the marital estate in favor of "growing" his business. *Cf. Schaumberg v. Schaumberg*, 875 P.2d 598, 603 (Utah Ct. App. 1994) (concluding that use of marital assets to increase the value of nonmarital property changed the character of the appreciated portion from a separate asset to a marital asset, of which each spouse was entitled to half). Whether the Agreement, if enforceable, circumscribes the trial court's ability to make that kind of adjustment is a question we need not answer, pending the trial court's determination on remand as to the validity of the Agreement.

_____