**2025 UT App 117**

## THE UTAH COURT OF APPEALS

CRAIG LEWIS TERRY,
Appellee,
*v.*
JAIME LYNETTE TERRY,
Appellant.

Opinion
No. 20231107-CA
Filed July 25, 2025

Third District Court, Salt Lake Department
The Honorable Laura Scott
No. 214903971

Emily Adams and Mikayla Irvin,
Attorneys for Appellant

Jennifer L. Falk and S. Spencer Brown,
Attorneys for Appellee

JUDGE JOHN D. LUTHY authored this Opinion, in which
JUDGES DAVID N. MORTENSEN and RYAN D. TENNEY concurred.

LUTHY, Judge:

¶1 Jaime Lynette Terry and her then husband, Craig Lewis Terry, received a joint settlement of $2,700,000 for personal injury claims arising from a motorcycle accident. When Craig[1] later petitioned for divorce, a substantial amount of the settlement proceeds remained unspent. In distributing the parties' assets in the divorce, the district court ruled that the remaining settlement proceeds were separate property. It then divided those proceeds

---

1. Because the parties share a surname, we refer to them by their given names, with no disrespect intended by the apparent informality.

based on what it believed each party's noneconomic damages would have been in a trial of their personal injury claims. The resulting distribution allocated $369,125.87 to Jaime as her separate portion of the remaining settlement proceeds and $1,925,847.13 to Craig as his separate portion of the remaining settlement proceeds.

¶2    Jaime appeals, contending that the settlement proceeds were commingled and, thus, that they became marital property and were subject to equitable division. Jaime's argument is well taken. Accordingly, we reverse the district court's determination that the remaining settlement proceeds were separate property, vacate the court's distribution of those proceeds, and remand this matter for further proceedings consistent with this opinion.

## BACKGROUND

### *The Accident*

¶3    Craig and Jaime were married in 2019. Two years into their marriage, they were both seriously injured when they were struck by a car while riding Craig's motorcycle. Craig fractured his left femur (in multiple locations), tibia, fibula, and calcaneus. He also broke his pelvis and sacrum. Ultimately, his left leg had to be amputated from the knee down. Jaime fractured her neck, pelvis, fibula, and all the bones in her left foot, leaving that foot permanently "deformed."

### *The Settlement*

¶4    Craig and Jaime hired an attorney to represent them as they sought compensation from their own insurer and the other driver's insurer. The attorney "did not delineate" Craig's and Jaime's injuries to the insurance companies but "made [claims] for . . . policy limits on behalf of both of his clients." Ultimately, Craig

and Jaime settled their claims for all applicable policy limits and received five checks, each made out to Craig, Jaime, and their attorney's law firm, for a total of $2,700,000. After Craig's and Jaime's already-incurred medical expenses and attorney fees were deducted, the remaining settlement proceeds—$1,894,000—were deposited into their joint bank account.

¶5    Craig and Jaime later met with Craig's financial advisor and then with Jaime's financial advisor to determine the best way to invest the remaining settlement proceeds. But the couple could not agree on an investment strategy, and, after some argument, Jaime withdrew approximately half of the remaining proceeds—$947,000—from the joint account and directed Craig to do the same, which he did.

*The Divorce Proceedings*

¶6    A few months later, Craig petitioned for divorce, and a trial was held to decide the distribution of Craig and Jaime's assets. Prior to trial, the district court observed that there were two possible approaches it could take to divide the remaining settlement proceeds. One approach, the court said, might be for it to "act as if [it was] the fact finder in an underlying personal injury case" and allocate the proceeds based on "the evidence regarding the accident, the nature of the injuries, [and] the economic and noneconomic damages." The other possibility the court identified was for it to determine that the "parties [had] commingled the settlement proceeds" by "not tak[ing] appropriate steps to allocate" them. In that event, the court explained, the division would "simply [be] a 50/50 split or something that looks more like what we would do with any account that has [marital] funds in it." At trial, the court heard testimony from Craig, Craig's doctor, a retired insurance adjustor who had been designated as an expert witness by Craig, and Jaime.

*The Property Distribution*

¶7 Before delivering its oral ruling following trial, the district court stated that it was "truly unfortunate" that it did not have the type of "underlying documentation" that "attorneys typically [provide]" regarding how to "treat[] each party separately" when it comes to dividing personal injury settlement proceeds. The court similarly noted that the insurance companies involved in the personal injury matter had also "not divide[d] [the] proceeds between the parties" even though "that's what they typically do."

¶8 The court then explained that because both parties' past medical expenses stemming from the accident had already been paid, and because the court had been given "no information at trial as to . . . the cost of the [parties'] future medical[] [expenses]" and no "testimony from which [it] could determine that any portion of [the] settlement . . . was intended for . . . future medical[] [expenses]," it deemed the remaining settlement proceeds to be "pain-and-suffering damages." And it noted that "the case law is clear that pain-and-suffering damages [are] separate property." Thus, the court ruled, the remaining settlement proceeds were separate property.

¶9 Having made that determination, the court still had to determine how much of the remaining settlement proceeds was Craig's separate property and how much was Jaime's separate property. Essentially employing the first alternative approach to property division it had identified prior to trial—namely, that of sitting as a hypothetical factfinder in a hypothetical trial of the underlying personal injury case—the court then set about placing a value on Craig's pain and suffering as a result of the accident and a value on Jaime's pain and suffering as a result of the accident. As a guide, the court looked to the following factors given in the Model Utah Jury Instructions for factfinders to consider when awarding noneconomic damages to personal injury plaintiffs:

> (1) the nature and extent of [the plaintiff's] injuries; (2) the [plaintiff's] pain and suffering, both mental and physical; (3) the extent to which [the plaintiff] has been prevented from pursuing [his or her] ordinary affairs; (4) the degree and character of any disfigurement; (5) the extent to which [the plaintiff] has been limited in the enjoyment of life; and (6) whether the consequences of [the] injuries are likely to continue and for how long.

Model Utah Jury Instructions 2d CV2004, https://legacy.utcourts.gov/muji/?cat=1&subcat=20 [https://perma.cc/3GVB-W8WA]. After weighing each of these factors (and expressly disagreeing with the values proposed by Craig's expert insurance adjuster), the court independently assigned a value of $3,000,000 to the noneconomic damages component of Craig's personal injury claim and a value of $575,000 to the noneconomic damages component of Jaime's personal injury claim, for a total of $3,575,000 in noneconomic damages from the underlying personal injury case.

¶10 Recognizing that the total settlement amount—$2,700,000—came to 75.5%[2] of the total value of the parties' noneconomic damages as determined by the court, the court then calculated 75.5% of the $3,000,000 it had assigned to Craig's noneconomic damages and 75.5% of the $575,000 it had assigned to Jaime's noneconomic damages. This resulted in a "base award of $2,265,734.27 for Craig" and a "base award of $434,265.73 for Jaime." From there, the court calculated that Craig's base award was 83.92% of the total settlement amount and Jaime's base award

---

2. In performing its calculations, the district court used precise percentages without rounding to the nearest tenth or hundredth of a percent. In its decree, however, the court recited rounded percentages. For ease of reading, we also recite the rounded percentages that appear in the decree.

was 16.08% of the total settlement amount. Then the court determined that "each party should be responsible for those percentages of the $405,000 in attorney[] fees" they had paid to their attorney. After calculating, on that basis, the respective dollar amounts of attorney fees that each party was responsible for and subtracting those amounts from the parties' base awards, the court arrived at a "net award to Jaime of $369,125.87" as her separate portion of the total settlement proceeds and a "net award to Craig of $1,925,847.13" as his separate portion of the total settlement proceeds. The court then ordered Jaime to pay Craig $577,874.13, which was the difference between the $947,000 she had withdrawn from the parties' joint account and the $369,125.87 to which she was entitled under the court's property distribution. Jaime now appeals.

## ISSUE AND STANDARD OF REVIEW

¶11    Jaime challenges the district court's determination that the remaining settlement proceeds were separate property. We recently "acknowledged that this court has inconsistently articulated the standard of review to be applied when reviewing a trial court's determination that property is marital or separate." *Krajeski v. Krajeski*, 2025 UT App 19, ¶ 14 n.5, 565 P.3d 544 (cleaned up), *cert. denied*, July 2, 2025 (No. 20250403). "Some opinions have treated the determination of the district court in this regard deferentially, reviewing it for an abuse of discretion, while others embrace [an] older correctness standard." *Id.* (cleaned up). Here, the parties both assert, without analysis, that an abuse of discretion standard should apply. We do not attempt to resolve the "nuanced question" of which standard of review should apply, because we conclude that the district court's decision does not withstand scrutiny under a correctness standard or an abuse of discretion standard. *Id.* "[W]e [again] leave open the prospect of more definitively deciding this [standard of review] question

in some future case in which it is briefed by the parties and material to our appellate decision." *Id.*[3]

ANALYSIS

¶12 Jaime contends that the settlement proceeds were commingled and, thus, became marital property because "Jaime and Craig's actions manifested an intent that the proceeds be marital [property]." She points specifically to the parties' actions in "hir[ing] a joint attorney, fil[ing] joint claims, negotiat[ing] joint settlements, [and] deposit[ing] the settlement proceeds into a joint account" as manifesting their intent to treat the settlement proceeds as marital property. While we do not necessarily deduce from Craig and Jaime's actions a specific intent to commingle the remaining settlement proceeds, we agree that their actions nevertheless resulted in a commingling of the proceeds due to the proceeds being inextricably and untraceably intertwined.

¶13 "In addressing the distribution of property between divorcing spouses, the trial court must first determine whether the assets in dispute are marital or separate property." *Keyes v. Keyes*, 2015 UT App 114, ¶ 28, 351 P.3d 90. "The presumption is that marital property will be divided equally while separate property will not be divided at all." *Krajeski v. Krajeski*, 2025 UT App 19, ¶ 18, 565 P.3d 544 (cleaned up), *cert. denied*, July 2, 2025 (No. 20250403). But "separate property is not absolutely insulated

---

3. As a second issue, Jaime also argues that, even if the remaining settlement proceeds were the parties' separate property, "the district court erred in its calculations" when dividing the separate property and that it ultimately arrived at a distribution of the separate property that "was inequitable." Because we determine that all of the settlement proceeds are marital property, we need not address Jaime's arguments regarding the court's division of the remaining proceeds when viewing them as separate property.

from division upon divorce." *Id.* ¶ 19. "In some situations, . . . property that begins as one spouse's separate property can lose its separate identity and become part of the marital estate." *Thorup v. Thorup*, 2024 UT App 93, ¶ 23, 554 P.3d 329. "Our case law has identified three such situations: (1) where separate property has been commingled into the marital estate; (2) where the other spouse has by his or her efforts or expense contributed to the enhancement, maintenance, or protection of that property, thereby acquiring an equitable interest in it; and (3) in extraordinary situations when equity so demands." *Id.* (cleaned up). This case implicates the commingling situation.

¶14 "With regard to commingling, one rather obvious situation in which commingling occurs is where one spouse has contributed all or part of the property to the marital estate with the intent that it become joint property." *Id.* ¶ 24 (cleaned up). Thus, "[c]ourts look to a party's actions as a manifestation of a spouse's intent to contribute separate property to the marital estate." *Dahl v. Dahl*, 2015 UT 79, ¶ 143, 459 P.3d 276. Moreover, "even short of an outright intended contribution, property that started out as separate property may be considered commingled if it becomes inextricably and untraceably intertwined with marital assets." *Thorup*, 2024 UT App 93, ¶ 24. "Quite important to any commingling analysis, then, is whether the property in question has retained its separate character." *Id.* (cleaned up).

¶15 Here, the property at issue is proceeds received in settlement of Craig's and Jaime's personal injury claims. "[C]ompensation for a personal injury can be either separate property or marital property, depending on the nature of the damages." *Andersen v. Andersen*, 2016 UT App 182, ¶ 20, 379 P.3d 933. "Specifically, amounts received as compensation for pain, suffering, disfigurement, disability, or other personal debilitation are generally found to be the personal property of the injured spouse in divorce actions." *Id.* (cleaned up). "But money realized as compensation for lost wages and medical expenses, which

diminish the marital estate, are considered to be marital property." *Id.* (cleaned up).

¶16    If the value of Craig's and Jaime's personal injury claims had been tried to a factfinder, that factfinder—either judge or jury—would have determined the amount of damages Craig and Jaime each suffered under each applicable category of damages. It would have then compiled those amounts and arrived at a total amount of damages suffered by Craig and a total amount of damages suffered by Jaime. By special verdict form (in the case of a jury) or detailed findings (in the case of a judge), the factfinder might also have indicated the amount of damages it assessed for each plaintiff under each component category of damages. However, none of that happened here. Instead, Craig and Jaime chose to negotiate a settlement of their claims with the insurance companies providing coverage for the accident.

¶17    "[S]ettlement values . . . , by definition, implicate compromise . . . ." *Limone v. United States*, 579 F.3d 79, 104 (1st Cir. 2009). And a compromise agreement is necessarily a reflection of the intent of the settling parties, *see Uintah Basin Med. Center v. Hardy*, 2002 UT 92, ¶ 20, 54 P.3d 1165 (stating that "the preeminent goal of contractual interpretation" is "to give effect to the intent of the parties"), not the result of an objective third-party determination of the value of the compromised claim. Thus, specific contours of a compromise agreement are generally discernable only to the extent that the parties to the agreement expressly delineate them. In a personal injury case, therefore, without an expressed intent by the compromising parties, it is impossible to know which categories of damages the settlement proceeds are meant to compensate for and in what amounts. And when a compromise involves multiple injured parties, the uncertainty is multiplied—not only is it impossible to trace a specific amount of settlement proceeds to a specific category of damages, it is also impossible to trace a specific amount of settlement proceeds to a specific claimant. Such is the case here.

¶18 Notwithstanding the district court's laudable effort to assign theoretically appropriate values to Craig's and Jaime's respective noneconomic damages, such an effort is simply ineffective to illuminate an intent—specifically, as to what and whose potential damages awards were compromised and to what extent—that the parties themselves never arrived at in the first place. Jaime and Craig made no effort to establish, prior to the divorce trial, what portion of the settlement proceeds reflected which injury to which party. They filed one joint claim. They did nothing to separate their injuries or claims as the claims were settled. They received five checks—each made out jointly to themselves and their attorney's law firm. After the total was reduced to pay their attorney fees and medical expenses, the remaining proceeds were deposited in a joint account, and together they consulted with financial advisors about how to invest the total remaining proceeds. The result is that the settlement proceeds were "inextricably and untraceably intertwined," *Thorup*, 2024 UT App 93, ¶ 24, with no post-hoc way to deduce how much of the proceeds Craig and Jaime intended to go to each of them. Unlike the prototypical case where separate property *loses* its separate character, the property here—proceeds of a settlement—never *achieved* its character as separate in the first place. For a time, Craig and Jaime each possessed individual claims against a tortfeasor and a first-party insurance policy. Those claims were not commingled, and our law recognizes the noneconomic damages portion of those claims as separate property. But the parties chose to settle all of the claims collectively by receiving payments that were commingled from their inception.

¶19 As already noted, under Utah law, when one spouse's separate property is inextricably and untraceably intertwined with *marital* property, the initially separate property becomes marital. *See id.* We similarly conclude that when each spouse allows his or her otherwise separate property to be inextricably

and untraceably intertwined with the other spouse's separate property, the otherwise separate property likewise becomes marital. *See id.* ("Quite important to any commingling analysis, then, is whether the property in question has retained its separate character."(cleaned up)). Under the facts of this case, as the parties' individual claims were compromised and converted to settlement proceeds, those proceeds did not obtain a separate character but were instead inextricably and untraceably intertwined from the moment they were disbursed. As a result, the proceeds are all marital property.

¶20 Craig seeks to avoid this conclusion by pointing to *Kimball v. Kimball*, 2009 UT App 233, 217 P.3d 733. In *Kimball*, we affirmed the district court's determination that a wife's separate stock proceeds that were temporarily deposited into the parties' joint accounts "regained" their "separate nature" when they were "taken out of those joint accounts and deposited into [the wife's] individual account." *Id.* ¶ 28. Craig argues that like the wife's separate stock proceeds in *Kimball*, the remaining settlement proceeds here were not commingled because they "sat in the parties' joint account for only a few weeks before being withdrawn entirely" and they "were traceable when deposited and withdrawn." Although Craig is correct that the remaining settlement proceeds *as a whole* were traceable as settlement proceeds when they were deposited and when they were withdrawn, the *portion* of those proceeds that belonged to Craig and the *portion* that belonged to Jaime had not been determined and, thus, were not traceable either when the proceeds were deposited or when they were withdrawn. This is in contrast to the wife's stock proceeds in *Kimball*, which were all traceable as her separate proceeds at both the time of deposit and the time of withdrawal from the joint account. *See id.* Accordingly, *Kimball* is unpersuasive here.

¶21 For the foregoing reasons, we vacate the district court's division of the remaining settlement proceeds and remand this

matter for the court to distribute those proceeds as marital property. Without expressing an opinion as to what that division should be, we observe that it should be based on the ordinary principles of marital property distribution, which include both "the general presumption that marital property be divided equally" and an acknowledgment that sometimes "exceptional circumstances [may] overcome [that] general presumption." *Dahl v. Dahl*, 2015 UT 79, ¶ 121, 459 P.3d 276 (cleaned up).

## CONCLUSION

¶22 The district court improperly determined that the remaining settlement proceeds were separate rather than marital property. We therefore reverse the district court's determination that the remaining settlement proceeds were separate property, vacate its distribution of those proceeds, and remand the matter for the court to distribute the remaining settlement proceeds as marital property.

––––––––––