2024 UT App 93

## THE UTAH COURT OF APPEALS

MONA THORUP,
Appellee,
*v.*
MARCUS THORUP,
Appellant.

Opinion
No. 20220583-CA
Filed July 5, 2024

Third District Court, Salt Lake Department
The Honorable Amy J. Oliver
Commissioner Joanna Sagers
No. 204906416

Jonathan G. Winn, Attorney for Appellant

Jenna Hatch, Attorney for Appellee

JUDGE RYAN M. HARRIS authored this Opinion, in which
JUDGES MICHELE M. CHRISTIANSEN FORSTER and JOHN D. LUTHY
concurred.

HARRIS, Judge:

¶1     In this case, we are asked to consider whether the district court properly allocated—as between a divorcing couple—the equity in the house in which the couple lived during their marriage. In particular, Marcus Thorup challenges the court's determination that substantial portions of the value of the house, which was originally his separate property, became commingled into the marital estate. We find merit in many of Marcus's arguments, and therefore reverse the court's equity allocation order and remand the case for further proceedings.

BACKGROUND

¶2     Marcus and Mona Thorup married in 1986.[1] Eleven years later, in 1997, they moved into a new house (the House) built—at the apparent cost of $445,000—by Marcus's father's construction company. For the next seven years, the House was titled in the name of Marcus's father's company, and Marcus and Mona lived there rent-free. During some of this time, Marcus and Mona obtained a homeowners insurance policy that listed both of them as "owners" of the House, even though that was not actually the case. And for a year or so around 1997, Mona's mother lived in a separate apartment on the property, and she paid Marcus and Mona some $13,000 that went toward the costs associated with building the separate apartment.

¶3     In May 2004, Marcus's father (through his company) "gifted" the House to Marcus "as an inheritance." Thereafter, title to the House was in Marcus's name; Mona was never placed on title. In December 2004, Marcus used the House as collateral for a $150,000 loan. Marcus later testified that the proceeds from the loan were not spent on the House but, instead, were spent on marital matters, such as medical bills, credit card bills, some other unspecified "investments," and a payment on the couple's "cabin lot." Over the next ten years, the loan was fully repaid, entirely with marital funds.

¶4     Between 1997 and 2020, Marcus, Mona, and their children lived in and maintained the House. They also made some improvements to the House over that time. For purposes of this dispute, Marcus retained an expert who determined that the out-of-pocket cost of the family's improvements had been $12,171,

---

1. Because the parties share the same last name, we use their first names for clarity, with no disrespect intended by the apparent informality.

and that the family's maintenance of and improvements to the House "contributed about $20,000 to its current value."

¶5     In 2020, Mona filed this divorce action and asked (among other things) that the House and all its equity be awarded to her. Marcus responded by filing a counterclaim in which he contended that the House was an "inheritance from his father" and was his "separate property." This dispute eventually worked its way to trial, and the parties agreed, by written stipulation, to resolve the issue by way of an "informal custody trial" before a domestic relations commissioner, a procedure usually limited to resolution of custody disputes and whose parameters are set forth in rule 4-904 of the Utah Code of Judicial Administration. Under this procedure, the parties agreed to "present[] their case[s]" to the commissioner, under oath, without questioning by attorneys. In addition to providing their own testimony, the parties agreed that they could each "present any documents they want[ed] the [c]ourt to consider" and that, "[a]fter the [c]ourt [had] heard from both parties," only then would attorneys be allowed "to make legal argument." In stipulating to this procedure, the parties agreed to "waive the normal question and answer manner of trial" and to "waive the rules of evidence," and they agreed that "[t]he other party [could] tell the [c]ourt anything he or she feels is relevant." The parties also waived their right to "challenge any of the documents or testimony that was considered" by the commissioner during the informal trial, and they agreed that "[t]he only issue on appeal [would] be whether the [c]ourt abused its discretion in reaching its findings and conclusions."

¶6     During the course of the informal trial—which took place over parts of two trial days—the commissioner heard from Marcus and Mona, who testified (largely through proffer by counsel) about the events described above. In addition, the parties by stipulation submitted sworn declarations and other similar documents from other witnesses, which evidence the commissioner accepted and considered. And the parties'

attorneys made extensive arguments, both in written briefs filed prior to the trial and in oral arguments made during the trial.

¶7 Mona took the position that, even if the House was originally Marcus's separate property, "the separate property converted into marital property during the marriage." She made two specific arguments in this regard, asserting both (a) that she had contributed to the value of the House through maintenance and improvements, and had thereby acquired an equitable interest in it, and (b) that the House had been commingled into the marital estate. Marcus, on the other hand, took the position that the House was, and always had been, his separate property, and that it had not been commingled into the marital estate. He acknowledged that "Mona may have a contribution claim" regarding the House, but he pointed to evidence indicating that the family's contributions had increased the value of the House by only $20,000, and he argued that, at most, Mona was therefore entitled to only $10,000 of the House's total value.

¶8 At the conclusion of the trial, and after hearing the arguments, the commissioner made an oral ruling, determining that much of the House's value—$150,000 of its original value, plus all of its appreciation—had been commingled into the marital estate. As support for this determination, the commissioner noted that the marital estate had repaid the $150,000 loan that used the House as collateral, and reasoned that the loan indicated "that the family in essence bought that mortgage and paid it back." The commissioner also relied on the facts that, during the period before Marcus was gifted the House, the parties obtained homeowners insurance indicating that they were both owners of it and that Mona's mother had paid $13,000 toward "the mother-in-law apartment being enhanced." And the commissioner found relevant the fact that Mona had been "responsible for maintaining" the House and its "landscaping." The commissioner also found—by averaging two appraisals—that the House was worth $312,500 in

2004 when it was gifted to Marcus and was worth $765,000 at the time of trial. The commissioner then concluded that Marcus should receive $162,500 ($312,500 minus $150,000) as his separate property, and that the parties would split the remaining $602,500 equally.

¶9 The commissioner's oral ruling was later encapsulated in written findings of fact and conclusions of law and a decree of divorce, which documents were signed by the assigned district court judge.

ISSUES AND STANDARDS OF REVIEW

¶10 Marcus now appeals, and he challenges the specific portions of the commissioner's ruling that concern allocation of the value of the House. In particular, he takes issue with the commissioner's determination that much of the House's value was commingled into the marital estate. And he challenges the finding that the House was worth $312,500 in 2004.

¶11 Mona asserts that, because this case comes to us from an "informal custody trial," the applicable standard of review is deferential and the scope of appeal is "steep and constricted." Mona is certainly correct that, when parties agree to resolve their issues through an informal trial, they waive their right to appeal certain evidentiary issues. *See* Utah R. Jud. Admin. 4-904(b)(7) (stating that parties may not appeal from an informal trial on "grounds that . . . rely upon the Utah Rules of Evidence"). In this case, Marcus and Mona agreed that they would "not be able to challenge any of the documents or testimony that was considered" during the proceeding, and neither party attempts to raise any evidentiary issues on appeal. But Mona is incorrect when she asserts that the appellate standards of review—on the issues that *are* appealable—are any different in appeals from informal trials than they are in other cases. The

court's ultimate ruling is appealable, *see id.* (stating that a "final order" from an informal trial "may be appealed on any grounds" other than grounds that "rely upon the Utah Rules of Evidence"), and will be reviewed under the same appellate standards of review that are applicable in appeals from formally tried cases.

¶12 Mona resists this conclusion by pointing to language in the parties' stipulation stating that "[t]he only issue on appeal will be whether the [c]ourt abused its discretion in reaching its findings and conclusions." She argues therefrom that all issues in this appeal—regardless of the usual standards of review—must be reviewed for abuse of discretion. We disagree. The form the parties used to encapsulate their stipulation is a form that—in keeping with the usual usage of the informal trial procedure—is designed for *custody* cases. We thus interpret the form's reference to the "abuse of discretion" standard as simply indicating that the court's ultimate ruling regarding custody will be reviewed as per usual: for abuse of discretion. *See Lobendahn v. Lobendahn*, 2023 UT App 137, ¶ 18, 540 P.3d 727 ("We review custody determinations under an abuse of discretion standard, giving the district court broad discretion to make custody awards." (quotation simplified)). We do not interpret the form as indicating that—for issues that are appealable—the standards of appellate review are any different in cases coming to us after an informal trial than they are in cases coming to us in the usual manner.

¶13 Now that we have determined that the standards of review in this appeal will be the same as in an appeal from a formally tried case, we must determine what those standards of review are. Marcus contends that both of the court's determinations that he is here challenging—regarding commingling and the House's value in 2004—are conclusions of law properly reviewed for correctness. Mona, on the other hand, asserts that these determinations are factual and reviewed for abuse of discretion or clear error. We agree with Mona.

¶14 "[District] courts are in the best position to determine whether property is marital or separate, and we defer to their findings of fact [in this regard] unless clearly erroneous." *Thompson v. Thompson*, 2009 UT App 101, ¶ 10, 208 P.3d 539; *see also Lindsey v. Lindsey*, 2017 UT App 38, ¶ 26, 392 P.3d 968 ("We generally defer to a [district] court's categorization and equitable distribution of separate property and uphold its determinations in that regard unless a clear and prejudicial abuse of discretion is demonstrated." (quotation simplified)). Thus, we review a district court's factual findings in this regard for clear error, and we review for abuse of discretion its ultimate determination of whether a particular item is separate or marital property.

¶15 And this same standard of review also applies to the more specific question of whether the House was commingled into the marital estate. *See Dahl v. Dahl*, 2015 UT 79, ¶ 143, 459 P.3d 276 (reviewing a commingling ruling for abuse of discretion); *Oliekan v. Oliekan*, 2006 UT App 405, ¶¶ 18–19, 147 P.3d 464 (same). A court's determination that a piece of originally separate property has been commingled into the marital estate is just a particular way of determining that the property is marital (rather than separate) property.

¶16 Finally, we also apply a deferential standard of review to Marcus's challenge to the court's finding regarding the value of the House in 2004. *See Marroquin v. Marroquin*, 2019 UT App 38, ¶ 10, 440 P.3d 757 ("We defer to [a] district court's findings of fact related to property valuation and distribution unless they are clearly erroneous." (quotation simplified)); *see also Rothwell v. Rothwell*, 2023 UT App 50, ¶ 33, 531 P.3d 225 ("A district court's factual determinations are clearly erroneous only if they are in conflict with the clear weight of the evidence, or if this court has a definite and firm conviction that a mistake has been made." (quotation simplified)), *cert. denied*, 537 P.3d 1011 (Utah 2023).

ANALYSIS

¶17    We first discuss Marcus's challenge to the court's ruling that much of the House's value had been commingled into the marital estate. We then turn to Marcus's challenge to the court's finding that the House was worth $312,500 in 2004.

### I. The House: Separate or Marital Property?

¶18    On the question of whether and to what extent the House constitutes marital property, we begin by discussing what is at issue in this appeal and—notably—what is *not* at issue in this appeal. Neither party challenges the court's determination that the House was originally Marcus's separate property when title was placed in his name in 2004. The court awarded Marcus $162,500, intended to represent the original value of the House in 2004, less the later loan amount. The basis for this award, as we understand it, was the commissioner's (at least implicit) determinations that the House was Marcus's separate property in 2004 and that Marcus is entitled to keep his separate property to the extent it was not commingled or subject to an equitable contribution made by Mona. No party challenges that portion of the commissioner's ruling.

¶19    Marcus does challenge two other aspects of the commissioner's ruling regarding the House's status as separate or marital property. First, Marcus challenges the commissioner's determination that $150,000 of the original value of the House— the amount of the December 2004 loan—had been commingled into the marital estate. Second, Marcus takes issue with the determination that the appreciation, over time, in the value of the House became commingled into the marital estate. We discuss these two challenges, in turn, after first setting forth applicable legal principles regarding separate property and commingling.

A. Background Legal Principles

¶20    One of the tasks courts often face in adjudicating divorce cases is making an equitable division of the marital estate between the divorcing spouses. Our supreme court has described this property-division process as follows:

> Before a district court distributes marital assets, it must (1) identify the property in dispute and determine whether it is marital or separate property, (2) consider whether there are exceptional circumstances that overcome the general presumption that marital property be divided equally, (3) assign values to each item of marital property so that a distribution strategy can be implemented, and (4) distribute the marital assets consistent with the distribution strategy.

*Dahl v. Dahl*, 2015 UT 79, ¶ 121, 459 P.3d 276 (quotation simplified). Marcus's first challenge concerns the first step in this process: assessing whether a particular piece of property—here, the House—is marital property that belongs to the marital estate or is instead separate property that belongs to him alone.

¶21    "Marital property ordinarily includes all property acquired during [the] marriage, whenever obtained and from whatever source derived." *Lindsey v. Lindsey*, 2017 UT App 38, ¶ 31, 392 P.3d 968 (quotation simplified). Separate property, on the other hand, includes each spouse's "premarital property"— that is, property owned by one spouse prior to the marriage—as well as "gifts[] and inheritances" received by a spouse during the marriage. *See id.*; *see also Mortensen v. Mortensen*, 760 P.2d 304, 308 (Utah 1988) (stating that courts should "generally award property acquired by one spouse by gift and inheritance during the marriage . . . to that spouse").

¶22 Property determined to be part of the marital estate will be divided equitably—and presumptively equally—between the divorcing spouses. *See Lindsey*, 2017 UT App 38, ¶ 32 ("The presumption is that marital property will be divided equally . . . ."). But separate property "will not be divided at all," *id.*, and will "generally" be awarded, "together with any appreciation or enhancement of its value," to the spouse whose separate property it is, *see Mortensen*, 760 P.2d at 308; *see also Lindsey*, 2017 UT App 38, ¶ 32 ("Equity generally requires that each party retain the separate property he or she brought into the marriage, including any appreciation thereof." (quotation simplified)).

¶23 In some situations, however, property that begins as one spouse's separate property can lose its separate identity and become part of the marital estate. *See Mortensen*, 760 P.2d at 308; *see also Lindsey*, 2017 UT App 38, ¶ 33 (stating that, sometimes, "circumstances warrant an equitable override of the separate-property retention rule"). Our case law has identified three such situations: (1) where "separate property has been commingled" into the marital estate, *Lindsey*, 2017 UT App 38, ¶ 33; (2) where "the other spouse has by his or her efforts or expense contributed to the enhancement, maintenance, or protection of that property, thereby acquiring an equitable interest in it," *Mortensen*, 760 P.2d at 308; and (3) "in extraordinary situations when equity so demands," *Lindsey*, 2017 UT App 38, ¶ 33.

¶24 First, with regard to commingling, one rather obvious situation in which commingling occurs is where "one spouse has contributed all or part of the property to the marital estate with the intent that it become joint property." *See Dahl*, 2015 UT 79, ¶ 143. But even short of an outright intended contribution, property that started out as separate property may be considered commingled if it becomes inextricably and untraceably intertwined with marital assets. *See id.* ("[P]remarital property may lose its separate character where the parties have inextricably commingled it with the marital estate . . . ."). Quite important to

any commingling analysis, then, is whether the property in question has retained "its separate character." *See id.* And this inquiry often turns on whether the property's separate identity can still be traced or accounted for. *See Mortensen*, 760 P.2d at 307 (stating that property is commingled when it "completely loses its identity and is not traceable"); *see also Pusey v. Pusey*, 728 P.2d 117, 119 (Utah 1986) (upholding a district court's determination that property was commingled because "it could not trace any assets to any source"). Indeed, in one case we phrased the relevant question as whether the property at issue "became so commingled that [it] could not be segregated" from the marital estate, and we determined that it had not, because "the marital and premarital interests were reasonably capable of being determined" and "it was still possible to trace and separately identify" the separate property. *Oliekan v. Oliekan*, 2006 UT App 405, ¶¶ 20–23, 147 P.3d 464. Thus, separate property will be considered commingled when it has been mixed in with marital assets to such a degree that it is no longer reasonably possible to distinguish between the separate and marital property. On the other hand, if "the marital and premarital interests" are still "reasonably capable" of being traced and identified, then the separate property retains its separate nature and will not be considered commingled. *See id.*

¶25　Second, "under the contribution exception, a spouse's separate property may be subject to equitable distribution when the other spouse has by his or her efforts or expense contributed to the enhancement, maintenance, or protection of that property, thereby acquiring an equitable interest in it." *Lindsey*, 2017 UT App 38, ¶ 35 (quotation simplified). "This exception may be satisfied when one spouse brings assets into the marriage and the other spouse's prudent investment of those assets substantially increases their value, or when marital funds are expended or marital debt is incurred for the benefit of one spouse's separate property." *Id.* (quotation simplified). "Under such circumstances, one spouse's effort or investment may render the other spouse's

underlying asset, its appreciated value, or some portion thereof subject to equitable distribution." *Id.*

¶26 Third, there exists a catch-all exception for situations—not covered by either of the first two exceptions—in which "extraordinary circumstances . . . warrant a departure from the presumptive rule." *Henshaw v. Henshaw*, 2012 UT App 56, ¶ 15, 271 P.3d 837. This exception is rarely applied; we have stated that the "bar for establishing an extraordinary situation is high, traditionally requiring that invasion of a spouse's separate property is the only way to achieve equity." *Lindsey*, 2017 UT App 38, ¶ 46 (quotation simplified).

¶27 During the informal trial, Mona made arguments under the first two of these exceptions, arguing that—even if the House was Marcus's separate property in 2004 when it was gifted to him—at least part of the House's value became part of the marital estate due to commingling or due to the family's equitable contribution. The commissioner accepted Mona's commingling argument, and therefore opted not to consider whether, or to what extent, Mona had acquired an equitable interest in the House through contributions.

### B. The $150,000 Loan

¶28 The first part of the commissioner's commingling analysis with which Marcus takes issue is the ruling that $150,000 of the House's original value became commingled into the marital estate. In December 2004, some seven months after the House was gifted to Marcus, he used the House as collateral for a $150,000 loan, and that loan was fully repaid, over the next ten years, with marital funds. The commissioner determined that, given these facts, "the marital estate paid for that portion of the [H]ouse directly by paying off the mortgage," and ruled that the amount of the House's original value collateralized by the loan ($150,000) was marital property rather than Marcus's separate property.

¶29　We acknowledge the facial appeal of the commissioner's ruling: the fact that the marital estate paid the loan back certainly makes it look like the estate might have acquired an interest in the House. But our supreme court has made clear that a separate asset does not necessarily become marital property simply because a marital estate pays back a loan drawn from that asset. *See Dahl v. Dahl*, 2015 UT 79, ¶¶ 142–145, 459 P.3d 276. At a minimum, more analysis is required in order to reach that conclusion.

¶30　In *Dahl*, a husband had possessed certain retirement accounts (IRAs) "prior to his marriage" that were his "separate property." *Id.* ¶ 142. During the marriage, the husband "withdrew funds from the IRA[s] to pay off a home equity loan secured by the marital home and then replenished the funds using a marital bank account." *Id.* The wife contended that, by this action, the husband had "commingled" the IRAs with marital assets and thereby "converted [them] to marital property." *Id.* ¶¶ 142, 144.

¶31　Our supreme court rejected the wife's argument, holding that the husband's actions did not cause the IRAs to lose "their separate identity." *Id.* ¶ 144. In the court's view, the transaction was "best characterized as a loan from [the husband] to the marital estate, which was in turn repaid with marital funds." *Id.* On the facts presented in *Dahl*, there was "nothing . . . suggesting that [the husband] intended to commingle his IRA funds with the marital estate." *Id.* And the court held that the IRAs "did not become so inextricably commingled into the marital estate that the district court was incapable of tracing [them]." *Id.* (quotation simplified). In summary, the court noted that the IRAs did not lose their "separate identity simply because [the husband] made a loan from [the IRAs] to pay off a home equity loan." *Id.* ¶ 145.

¶32　The lesson of *Dahl*, as relevant here, is that when one spouse uses his or her separate property to facilitate a loan to the marital estate, the proceeds from that loan are used to benefit the marital estate, and the marital estate pays the loan back with

marital funds, the separate property used to facilitate the loan does not, simply by virtue of the loan, become commingled into the marital estate.

¶33    Marcus asserts that *Dahl* is materially indistinguishable from this case. As he sees it, he facilitated a loan to the marital estate using his own separate property—the House—as collateral, and the marital estate was obligated to pay that loan back just like it would have needed to pay off a loan collateralized in any other way. He asserts that—just like the transaction in *Dahl*—nothing about this transaction indicates any intent on his part to commingle the House with the marital estate. And he notes— correctly—that this loan did not render a factfinder incapable of tracing his separate property. We find Marcus's arguments at least potentially persuasive, and we note that Mona (in her appellate brief) did not cite *Dahl* and made no effort to rebut Marcus's argument that *Dahl* is controlling here.

¶34    We agree with Marcus that the commissioner's analysis is at odds with *Dahl*.[2] The commissioner's analysis on this point was quite brief, and simply assumed that, because the marital estate repaid the $150,000 loan amount, it had "paid for that portion of the [H]ouse directly." As noted, it does not necessarily follow, simply from the fact that the marital estate repaid the loan, that

---

2. In fairness to the commissioner, Marcus did not cite *Dahl* during the informal trial. But this does not present a preservation problem, because litigants are permitted to cite new authority for the first time on appeal to support arguments regarding issues properly raised below. *See Patterson v. Patterson*, 2011 UT 68, ¶ 18, 266 P.3d 828 ("[W]e routinely consider new authority relevant to issues that have properly been preserved . . . ."). In this instance, the parties raised the relevant issue at the informal trial—whether $150,000 of the House's original value was commingled into the marital estate—and are therefore entitled to bring new authority to our attention on appeal bearing on this preserved issue.

the asset that facilitated the loan—here, the House—became commingled into the marital estate. *See id.* ¶ 144.

¶35 The question of whether repayment of the loan by the marital estate resulted in commingling turns on whether the proceeds of the loan were used for marital-estate purposes unrelated to the House or were, instead, used to increase the value of the House. If the proceeds were used—as they were in *Dahl*—entirely for marital-estate purposes unrelated to the asset leveraged for the loan, then Marcus is correct that the situation here would be materially indistinguishable from *Dahl*, and the transaction would be "best characterized as a loan . . . to the marital estate" facilitated by Marcus's separate property. *See id.* On the other hand, if the loan proceeds were used to improve the House, the marital estate's repayment of that loan might accurately be said to have resulted in the marital estate "[paying] for that portion of the [H]ouse directly," a situation that might support a determination that commingling (or, alternatively, acquisition of an equitable interest) had occurred.

¶36 On the question of what the loan proceeds were used for, the commissioner made no findings. Marcus testified that the loan proceeds were spent not on the House (or on any other personal endeavors of Marcus) but on marital things, such as medical and credit card bills, other unspecified "investments," and a payment on the couple's "cabin lot." But neither in the oral ruling made at the conclusion of the informal trial nor in the written ruling issued thereafter did the commissioner make any specific findings about either the credibility of Marcus's testimony on this point or about whether any of the loan proceeds were spent on the House.[3]

---

3. At the conclusion of the informal trial, the commissioner stated that some of the loan proceeds were "used to pay some medical bills for" Mona. It is unclear from the record whether this

(continued…)

¶37 In the end, we view the commissioner's analysis as incomplete. Because the reason the commissioner gave for determining that the loan amount had been commingled does not necessarily support that conclusion, and because the commissioner did not make certain factual findings necessary to complete the analysis, we must reverse the commissioner's determination that $150,000 of the House's original value was commingled into the marital estate, and we remand the matter to the district court for further proceedings on this point.

## C. The House's Appreciation

¶38 The second part of the commissioner's commingling analysis with which Marcus takes issue is the ruling that all of the House's appreciation since 2004—an amount the commissioner determined to be $452,500 ($765,000 minus $312,500)—was no longer Marcus's separate property because it had been commingled into the marital estate. As support for this ruling, the commissioner cited (a) the homeowners insurance policies acquired before Marcus owned the House that listed both Marcus and Mona as "owners," (b) Mona's testimony that she was responsible for maintaining the House and its landscaping, and (c) the fact that Mona's mother had paid $13,000 toward "a mother-in-law apartment" in the late 1990s. Even applying a deferential standard of review, we agree with Marcus that the commissioner committed an abuse of discretion in so ruling.

¶39 We begin our analysis by repeating the long-established legal principle that, ordinarily, appreciation on separate property belongs not to the marital estate but, rather, to the spouse whose

---

statement constituted an oral factual finding or merely a musing on the part of the commissioner, and no such finding appears in the written ruling. In any event, we are unaware of any statements or findings, written or oral, made by the commissioner about whether any of the loan proceeds were used on the House.

separate property it is. *Mortensen v. Mortensen*, 760 P.2d 304, 308 (Utah 1988) (stating that separate property, "together with any appreciation or enhancement of its value," belongs to the separate spouse); *Keyes v. Keyes*, 2015 UT App 114, ¶ 28, 351 P.3d 90 ("In most cases, equity requires that each party retain the separate property that he or she brought into the marriage, including any appreciation of the separate property." (quotation simplified)); *Thompson v. Thompson*, 2009 UT App 101, ¶ 12, 208 P.3d 539 ("An award of separate property includes its appreciation during the marriage."); *Burt v. Burt*, 799 P.2d 1166, 1169 (Utah Ct. App. 1990) ("Inherited or donated property, as well as its appreciated value, is generally regarded as separate from the marital estate and hence is left with the receiving spouse in a property division incident to divorce.").

¶40 This general rule—that a spouse should receive his or her separate property, together with any appreciation—may be varied on the basis of commingling, but only when it is clear that the spouse intended to contribute the property to the marital estate, or when it becomes functionally impossible to trace or account for the separateness of the spouse's property. *See Oliekan v. Oliekan*, 2006 UT App 405, ¶¶ 20–23, 147 P.3d 464 (stating that the question in commingling cases is whether the property "became so commingled that [it] could not be segregated" from the marital estate, and determining that commingling was not present because "the marital and premarital interests were reasonably capable of being determined" and because "it was still possible to trace and separately identify" the separate property); *see also Dahl*, 2015 UT 79, ¶ 143 ("[P]remarital property may lose its separate character where the parties have inextricably commingled it with the marital estate, or where one spouse has contributed all or part of the property to the marital estate with the intent that it become joint property.").

¶41 Commingling occurs most commonly with money, because dollars are fungible and, when separate money is

deposited into the same account as marital money, it can become difficult to tell which dollar is which. *See, e.g.*, *Pusey v. Pusey*, 728 P.2d 117, 119 (Utah 1986) (affirming a district court's finding "that throughout the marriage [the husband] had commingled corporate and personal funds so that [the court] could not trace any assets to any source"). Yet even money will not be considered commingled if the separate property funds can be identified and traced. *See, e.g.*, *Oliekan*, 2006 UT App 405, ¶ 23 (affirming a district court's determination that no commingling had occurred because "it was still possible to trace and separately identify the funds" at issue); *accord Arnason v. Arnason*, 2002 UT App 243U, para. 2.

¶42 Real property is easier to trace than money, and it is therefore perhaps not as common for commingling to occur with regard to real property as it is with money. *Cf. Dahl*, 2015 UT 79, ¶ 146 ("A spouse can maintain the separate identity of premarital [real] property by utilizing section 1031 exchanges to avoid commingling separate property with marital property."). But it is at least conceivable that separate real property—or at least the proceeds therefrom—can become commingled into a marital estate. For instance, in one case we concluded that, where proceeds from the sale of separate property (including real property) had been "deposit[ed] into the parties' joint accounts" and thereby lost its separate identity, commingling had occurred. *Dunn v. Dunn*, 802 P.2d 1314, 1321 (Utah Ct. App. 1990). And in other cases, we have observed that, where significant or substantial marital assets are invested to support, maintain, or improve separate real property, commingling may have taken place. *Keiter v. Keiter*, 2010 UT App 169, ¶ 23, 235 P.3d 782 (stating that "expending marital funds toward otherwise separate real estate supports a determination of commingling that may convert separate property into marital property"); *Schaumberg v. Schaumberg*, 875 P.2d 598, 603 (Utah Ct. App. 1994) (affirming a district court's determination that commingling of the "appreciated portion" of a husband's

separate real property had occurred where the parties had "used substantial marital funds to maintain and augment" the property).

¶43    In this case, however, the House was never sold, and therefore no proceeds from any sale were ever deposited into a marital account. And there was no evidence presented that the parties invested significant sums of marital money into supporting, maintaining, or otherwise improving the House. Here, tracing the separate nature of the House, including the appreciation in its value, is fairly obvious, and we see no evidence indicating that the House ever lost its separate identity.

¶44    In particular, we find the evidence upon which the commissioner relied unpersuasive and entirely unsupportive of a determination that all appreciation of the House after 2004 was commingled into the marital estate. Two of the three items upon which the commissioner relied—that both Marcus and Mona appeared as "owners" on homeowners insurance policies, and that Mona's mother paid $13,000—occurred prior to 2004, before Marcus even owned the House. These items therefore have extremely limited value in the analysis, and they simply do not point to any commingling of post-2004 appreciation.

¶45    The other item upon which the commissioner relied—the fact that Mona had been involved in some of the maintenance of the House, especially the landscaping—is likewise insufficient to support a determination that the entirety of the House's appreciation was commingled into the marital estate. As noted above, the investment of substantial marital assets into separate real property can support a determination that the separate property was commingled. *See Keiter*, 2010 UT App 169, ¶ 23; *Schaumberg*, 875 P.2d at 603. But here, no such evidence was presented; Mona did not offer evidence of any specific monetary contributions, nor did she attempt to provide many particulars about the nature of her landscaping and other

contributions.[4] One spouse's residence at, and assistance with the day-to-day maintenance of, the other spouse's separate real property will not usually be enough to render the entirety of that property's appreciation commingled into the marital estate. Under the circumstances presented here, we conclude that Mona's rather non-specific contributions to maintenance and landscaping are insufficient to support a determination that the entirety of the House's appreciation was commingled into the marital estate.

¶46    That is not to say that such contributions are irrelevant to the ultimate separate-or-marital-property analysis. As noted, Mona also made an argument, at the informal trial, that she had made an equitable contribution to the value of the House that should be recognized under the contribution exception to the general rule that separate property goes to the individual spouse. While Mona's evidence is insufficient to support a determination that the entirety of the House's appreciation was commingled into the marital estate, such evidence might be sufficient to support a determination that Mona made an equitable contribution to the House that ought to be quantified and recognized in the distribution of marital property.

---

4. The best evidence of Mona's contributions appears to be found in her answer to a written interrogatory from Marcus that asked her to "detail" all her contributions to the House. In that answer, she stated generally that she "maintained and upkept" the House and "was in charge of maintaining the yard." She also described other remodeling and maintenance activities, such as helping to repaint, retile, and redecorate various rooms in the House. But she made no effort—whether in that interrogatory response or otherwise—to quantify her efforts in dollars, and she did not hire an appraisal expert to assess any increase in value to the House that her efforts might have brought about or to rebut Marcus's appraisal expert's conclusions in that regard.

¶47    Accordingly, we conclude that the commissioner committed an abuse of discretion in determining, on this record, that the entirety of the House's appreciation had been commingled into the marital estate, and we therefore reverse that determination. We remand the matter, however, so that the district court might have an opportunity to consider Mona's alternative argument—not reached by the commissioner—that she made an equitable contribution to the value of the House that should be considered in the distribution of the marital estate.

## II. The House's 2004 Value

¶48    Marcus also challenges the court's finding that the value of the House, when it was gifted to him in 2004, was $312,500. Marcus argues that the House's value was actually $445,000—the amount his father's construction company spent to build it. On this record, however, we conclude that the court's finding is supported by competent evidence and that the commissioner therefore did not commit clear error in making it.

¶49    When a court is asked to value real property, it may do so in any one of several ways, depending on the evidence presented. Certainly, one way to value a house is to assess how much it cost to build it. *See Carter v. Sorenson*, 2004 UT 33, ¶ 2, 90 P.3d 637 (referring to the "traditional appraisal methods" as "the cost approach, the income approach, and the sales comparison approach"). But more commonly, appraisers value residential real property using a "comparable sales" approach, in which they attempt to "locate and analyze sales of 'comparable' properties . . . between a willing buyer and a willing seller in which the sale price is determined by market forces." *See Utah Dep't of Transp. v. Admiral Beverage Corp.*, 2011 UT 62, ¶ 40, 275 P.3d 208.

¶50    During the informal trial, Marcus presented evidence that his father's construction company spent $445,000 to build the House in the 1990s. Had that been the *only* evidence presented at

trial, Marcus may have a credible argument that the court committed clear error by not adopting that methodology in assessing the House's 2004 value. But that was not the only evidence presented at trial. Marcus also presented an appraisal of the House, as of May 2004, that applied a comparable-sales methodology; the first draft of that appraisal valued the House at $285,000, and an "amended draft" valued it at $340,000. The court found, based on this evidence, that the best indication of the value of the House in 2004 was an "averag[e] of the two values proposed by" Marcus's appraiser, which is $312,500.

¶51 This finding is amply supported by evidence in the record and is therefore not clearly erroneous. *See Kimball v. Kimball*, 2009 UT App 233, ¶ 20 n.5, 217 P.3d 733 ("The pill that is hard for many appellants to swallow is that if there is evidence supporting a finding, absent a legal problem—a fatal flaw—with that evidence, the finding will stand, even though there is ample record evidence that would have supported contrary findings." (quotation simplified)). We therefore reject Marcus's challenge to the court's finding that the House was worth $312,500 when it was gifted to him in 2004.

CONCLUSION

¶52 We reject Marcus's challenge to the court's factual finding regarding the value of the House in 2004. But we sustain Marcus's challenges to the court's commingling determination, and specifically to its rulings that (a) $150,000 of the House's original value was commingled and (b) the entirety of the House's post-2004 appreciation was commingled. We therefore reverse the court's equity allocation order, and we remand the case to the district court for further proceedings, consistent with this opinion, regarding the use to which the parties put the 2004 loan proceeds and regarding Mona's claim to an equitable interest in the appreciation of the House under the contribution exception.