**2025 UT App 149**

## THE UTAH COURT OF APPEALS

SHAUNA H. STEPHENSON,
Appellee,
*v.*
KERRY KAY STEPHENSON,
Appellant.

Opinion
No. 20220469-CA
Filed October 17, 2025

Third District Court, Salt Lake Department
The Honorable Randall N. Skanchy
No. 164903861

Julie J. Nelson, Attorney for Appellant

Mary C. Corporon and Kristen C. Kiburtz,
Attorneys for Appellee

JUDGE RYAN M. HARRIS authored this Opinion, in which
JUDGES DAVID N. MORTENSEN and RYAN D. TENNEY concurred.

HARRIS, Judge:

¶1 After six years of divorce litigation, including two separate bench trials, the district court entered a final order distributing marital property between Shauna H. Stephenson and Kerry Kay Stephenson. Kerry[1] appeals that order, arguing (among other things) that the district court did not properly credit him for expenses he incurred in managing marital assets during the pendency of the case. We affirm in part and reverse in part, and we remand this case to the district court for further proceedings.

---

1. Because the parties share the same last name, we follow our usual practice of referring to them by their first names, with no disrespect intended by the apparent informality.

BACKGROUND

¶2 Kerry and Shauna married in 1985. In 2016, after thirty-one years of marriage, Shauna filed for divorce. During their marriage, Kerry and Shauna owned various properties, as well as savings, investment, and retirement accounts. Relevant to this appeal, they owned a company—KMK Properties LLC (KMK)—that held a single commercial rental property (the KMK property), and the rental revenue from KMK was the parties' main source of income. In addition to KMK, the parties owned their primary residence and another residential property—known as Bell Canyon—which was under construction at the time the petition for divorce was filed. Among their various accounts, the parties owned a joint investment account (the Investment Account) valued at $197,584 at the time of separation.

¶3 After Shauna filed for divorce, the court entered a temporary order for the management of the parties' assets during the pendency of the case. In that order, the court granted Shauna possession of the parties' primary residence and granted Kerry possession of Bell Canyon, authorizing Kerry to complete the construction of that residence. The order stated, "The [Bell Canyon home] should be completed as soon as possible with the goal of having the home completed and receiving a certificate of occupancy by the end of 2016. However, this temporary order shall not be construed to require [Kerry] to complete the construction if he elects not to." The court further ordered that Kerry manage KMK, requiring Kerry to distribute $3,000 monthly from KMK revenue to himself and $3,000 to Shauna, while allocating all remaining KMK revenue to a joint account from which KMK's expenses were to be paid.

¶4 In early 2019, Kerry negotiated a new lease with KMK's tenant that increased KMK's monthly rental revenues to $15,000 and "required the tenant to pay all expenses of the property, including building insurance, property taxes, maintenance and

repairs to the property." Kerry also liquidated at least part of the Investment Account and deposited the proceeds into his personal bank account. Kerry then transferred, in a series of transactions, part of these funds from his personal account to KMK's business account and booked these transactions as "personal loans" from Kerry to KMK. Kerry used some of the funds from KMK's business account for construction work on Bell Canyon, as well as for personal expenses and attorney fees for the divorce case.

¶5    Later that year, the case proceeded to a two-day bench trial. After that trial, the parties reached a stipulation—later memorialized into an order—providing, among other things, that:

- the parties would each receive $6,000 per month from the $15,000 monthly rental revenue KMK received, with the remaining $3,000 to be held to cover KMK's expenses;

- Kerry would receive a property management fee of 5% of KMK's gross rental revenue;

- the KMK property would be listed for sale; and

- Bell Canyon would be listed for sale.

¶6    However, this stipulated order "resulted in disagreement and argument between the parties," protracting the litigation further. Shauna asserted, among other things, that she had not received all of her KMK distributions and that both Bell Canyon and the KMK property had not been listed for sale. So, the district court held another hearing, five months later, to address the parties' continued disputes. Frustrated, the court offered its view that the "parties need[ed] to move forward" and that it could not "assess whose delay it [was]," so it would "make decisions . . . that [would] move this case forward and then move people off their intractable positions." The court ordered that the KMK rental distributions be divided equally between the parties, with each

party receiving $7,500 monthly "regardless of what the expenses are" (the 2019 Order). Kerry objected, arguing that dividing the revenue this way would harm him because he would then be responsible for covering any KMK expenses with his half of the proceeds. The court responded that "if getting . . . to the bottom line means that KMK is going to go under, then it goes under. And that's the way it is." The court explained that the case had "been pending for four years with the same arguments being made" and "maybe" the court's ruling would "light a fire under somebody to get this thing done." The court urged the parties to get Bell Canyon and the KMK property listed and sold.

¶7 Eventually, both Bell Canyon and the KMK property were sold, and the parties agreed that the proceeds should, in theory, be divided equally. But the parties disagreed about whether and to what extent each should receive credits and offsets for expenses they claimed to have paid on behalf of the marital estate.

¶8 To resolve these issues, the court held another trial, and this one lasted for five days. During the trial, the parties presented "dueling accounting explanations" from accounting experts regarding their claimed credits and offsets. Kerry sought credit for his labor and expenses related to the Bell Canyon construction, as well as credit for his management of KMK; on that score, he sought a 5% management fee from the date of separation until sale, a salary of $108,900, and a 3% fee for renegotiating the new lease in 2019. Kerry also sought reimbursement for other KMK business expenses, including commercial insurance of $7,127, "building insurance" of $8,153, and a city bond for $3,808. Some of these expenses were incurred before the 2019 Order, while others were incurred after. In support of his requests, Kerry presented his own testimony, the testimony of KMK's accountant, and receipts documenting the expenses. In response, Shauna's retained accountant testified that Kerry used KMK funds to pay for his personal expenses as well as Bell Canyon expenses and that, given the way Kerry had combined his personal expenses

with the Bell Canyon expenses, there was "very little" about the accounting that made it clear and understandable.

¶9 Shauna sought, among other things, credit for distributions from KMK she claimed she did not receive in 2020 and 2021. She testified that she had not received $45,000 in rental distributions in 2020 (for six months) and another $15,000 in distributions in 2021 (for two months). In support, she submitted an exhibit summarizing the missing distributions and noting in relevant part that she was missing five distributions in 2020 (August through December) totaling $37,500 and two in 2021 (February and March) totaling $15,000. Kerry's documentation for 2020 was consistent with Shauna's exhibit, but his documentation for 2021 conflicted with Shauna's, noting only one missing distribution of $7,500.

¶10 A few weeks after trial, the court issued a lengthy written ruling finalizing the property division (the Final Order). In that order, the court identified all the relevant property—the KMK property, Bell Canyon, and the Investment Account—as marital property that was "subject to distribution after offsets or adjustments." In turn, the court concluded that the parties were each entitled to half ($440,534) of the proceeds of the Bell Canyon sale, with an adjustment stipulated to by the parties, and half (some $1.35 million) of the proceeds of the KMK property sale, subject to the parties' claims of offsets and credits. The court also determined that the parties were each entitled to half ($98,792) of the value of the Investment Account, which the court valued at $197,584 at the time of the parties' separation. In the final breakdown of the property distribution, the court credited Shauna $98,792 in a line item under the "[a]mounts [d]ue" from Kerry to Shauna for her half of the Investment Account.

¶11 The court also concluded that KMK's income and expenses during the pendency of the litigation were attributable to the marital estate. The court explained that KMK and its business account "were joint marital assets at the time of separation, and

. . . remained marital property." The court further determined that "the accounting of this business was commingled with personal expenses of [Kerry] and marital expenses for expenses incurred in the work on Bell Canyon." Because of this, the court ruled that it would "attribute all funds in this KMK account to be marital property, and all funds subsequently commingled into it [would] be marital property subject to offsets as later set forth." On this point, the court addressed the testimony of Kerry's expert, explaining that although the expert tried to reconcile "these commingled accounts in an attempt to appropriately allocate KMK business, [Kerry's] personal expenses, and Bell Canyon expenses," the expert "chose to ignore the fact that monies [Kerry] claimed as personal monies were actually marital assets," apparently referring to the funds transferred from the Investment Account or other joint accounts into his personal account. As an example, the court noted that one of Kerry's exhibits included a transaction entitled "working capital" for Bell Canyon as a "personal loan" from Kerry "when actually, it was entirely a marital asset." The court added that Kerry's expert, who had been working as KMK's accountant, had been uncooperative in providing financial information to Shauna and had provided testimony in Kerry's favor. With all of this in mind, the court stated it was hesitant "to rely on much" of the information generated by Kerry's expert. The court then stated that it would "allocate against the marital estate some of the expenses for Bell Canyon, with a presumption that some allocations by [Kerry and his expert were] simply not supported by credible evidence."

¶12 After addressing each item of marital property, the court addressed the parties' claims for offsets and credits. First, regarding the Bell Canyon expenses, the court rejected Kerry's claim for $10,000 in "unrecorded" expenses for construction costs because "[n]o evidence ha[d] been provided other than [Kerry's] representation to corroborate these expenses." The court also rejected Kerry's claim for $203,175 in "labor costs" he allegedly expended on Bell Canyon, explaining that "without evidence to

corroborate the actual work expended by [Kerry], and the apparent attempt to charge the marital estate at an absurdly high hourly rate for labor, for among other things, the changing of smoke alarm batteries," Kerry had failed to present "credible evidence to meet his burden of proof." Finally, the court rejected Kerry's request for an offset for the "personal loans" he purportedly contributed to the construction of Bell Canyon because, as the court had stated before, these transfers "actually came from joint monies of the marital estate and as a result [did] not accrue to [Kerry] as a 'personal loan' for which he [was] entitled to a personal claim of offset."

¶13 In that same vein, the court rejected Kerry's claim of $172,485 for the "completion costs" of Bell Canyon. The court seemed to acknowledge the legitimacy of these expenses, explaining that Kerry's trial exhibit showing approximately $172,485 in "completion costs" was "a more reliable representation of the charges appropriately attributable to completion costs" of Bell Canyon. And the court apparently referred to these expenses in another part of the Final Order when it explained that it would attempt "to allocate against the marital estate some of the expenses for Bell Canyon." Yet the court ultimately disregarded this claim for credit because it found that the "completion costs, whatever they may have accurately been, were paid with marital monies and therefore [were] not an offset against either party." In turn, the court stated that it "finds $172,485.23 as the cost of completion of Bell Canyon, which [would] be deducted against the sale price," and that there would be "no offset against the sale for monies spent on completion."

¶14 The court likewise rejected many of Kerry's claims of offsets for KMK expenses. Specifically, the court rejected his claim for a 5% management fee for services provided before the 2019 Order, explaining that "[t]here was no agreement between the parties, nor any order of the [c]ourt, . . . for management of KMK until the parties entered into a stipulation in June 2019." However,

the court credited Kerry $11,500 for a management fee "from June 2019 through March 2021 as was stipulated by the parties." The court next rejected Kerry's claim for a 3% fee for the renegotiation of the KMK lease, explaining that "there was no agreement by the parties for such an additional fee to be incurred on top of the fee [Kerry] was already receiving for management of KMK," that Kerry was not a "broker, realtor, [or] third party entitled to such a fee," and that his claim was "unsupported by any evidence as to [the] time expended or a reasonable rate for such a service." Finally, the court rejected his claim to $108,900 as a salary "on the same basis" as it had rejected his two previous claims.

¶15 The court also addressed Shauna's claim for missing rental distributions and credited her $60,000. The court relied on Shauna's exhibit summarizing her missing distributions and explained that the exhibit "reflects $60,000 in unpaid KMK rental distributions, $45,000 of which was not paid in 2020."

¶16 The court next addressed the significant disparity between the parties' calculations of net revenue for KMK's rental proceeds from the time of separation to KMK's sale. Kerry's calculation included deductions for the expenses discussed above. The court explained that the "total KMK expenses reflected on [Kerry's statement of income and expenses] include[d] items such as management fees, property maintenance work (*already excluded by the* [*c*]*ourt*), property management; and legal fees," and as a result, the court concluded that Kerry's evidence was "largely unusable" because "it contain[ed] claims and expenses *disallowed by the* [*c*]*ourt*." (Emphasis added.) After "[a]dding these fees back into the [net] income," the court found that the expenses had been reduced "from $678,272.97 to $171,003.71." But the court did not elaborate on what constituted the $171,003 remaining expense figure. Shauna's calculation, in the court's view, "allegedly reflect[ed] total net rental revenue from separation until sale of KMK but [did] not account for expenses poured into Bell Canyon or KMK." With these competing calculations, the court explained

that it was "left with a decision of net rental income for KMK of [Shauna's] $783,482.91 claim and [Kerry's] adjusted claim figure of $507,269.26." In resolving this disparity, the court decided that the "parties had negotiated and stipulated to a division of the rental income as it came in, and the [c]ourt [would] not make any adjustment except to include the cash in the KMK account post sale." Accordingly, the court did not specifically address at least some of the KMK expenses that had accrued after the 2019 Order, and it made no findings about what those expenses actually were.

ISSUES AND STANDARDS OF REVIEW

¶17   Kerry now appeals, and he asks us to review the district court's division of property. "Generally, district courts have considerable discretion concerning property distribution in a divorce proceeding and their determinations enjoy a presumption of validity." *Dahl v. Dahl*, 2015 UT 79, ¶ 119, 459 P.3d 276 (cleaned up). In this context, we will uphold the decision "unless a clear and prejudicial abuse of discretion is demonstrated." *Id.* (cleaned up). "In reviewing a property distribution, we will not set aside findings of fact, whether based on oral or documentary evidence, unless they are clearly erroneous, and we give due regard to the district court's superior position from which to judge the credibility of witnesses." *Id.* ¶ 121.

¶18   Kerry also challenges part of the court's property division as unsupported by sufficient evidence. "A challenge to the sufficiency of the evidence concerns the [district] court's findings of fact." *Cummings v. Cummings*, 821 P.2d 472, 476 (Utah Ct. App. 1991). As already noted, we will not set aside findings of fact unless they are clearly erroneous. *Dahl*, 2015 UT 79, ¶ 121. And a district "court's factual determinations are clearly erroneous only if they are in conflict with the clear weight of the evidence, or if this court has a definite and firm conviction that a mistake has been made." *Cummings*, 821 P.2d at 476 (cleaned up).

ANALYSIS

¶19     Under Utah law, the primary purpose of property division in a divorce proceeding "is to achieve a fair, just, and equitable result between the parties." *Boyer v. Boyer*, 2011 UT App 141, ¶ 10, 259 P.3d 1063 (cleaned up). In a divorce, "marital property is ordinarily divided equally between the divorcing spouses and separate property . . . will be awarded to the acquiring spouse." *Stonehocker v. Stonehocker*, 2008 UT App 11, ¶ 13, 176 P.3d 476 (cleaned up); *see also Fischer v. Fischer*, 2021 UT App 145, ¶ 23, 505 P.3d 56 ("In dividing the marital estate in a divorce proceeding, each party is presumed to be entitled to fifty percent of the marital property." (cleaned up)).

¶20     In dividing the marital estate, a district court is provided "considerable discretion in adjusting the financial and property interests of the parties, and its actions are entitled to a presumption of validity." *Goggin v. Goggin*, 2013 UT 16, ¶ 44, 299 P.3d 1079 (cleaned up). Because of this broad discretion, an appellant who is challenging a marital property division "has the burden to prove that either (1) there was a misunderstanding or misapplication of the law resulting in substantial and prejudicial error; (2) the evidence clearly preponderated against the finding; or (3) such a serious inequity has resulted as to manifest a clear abuse of discretion." *Id.* (cleaned up).

¶21     In this case, Kerry challenges the district court's property division in three respects. First, he argues that the court abused its discretion when it rejected his claim for credit for the "completion costs" of Bell Canyon.[2] Second, Kerry raises a similar challenge

---

2. Early in his opening brief, Kerry presents this issue on appeal as follows: "Whether the [district] court abused its discretion when it valued the marital estate as of the date of separation and then refused to make Kerry whole by crediting him for the marital

(continued…)

regarding the district court's rejection of his claim for expenses related to KMK after the 2019 Order. Finally, Kerry challenges the district court's credit to Shauna of $60,000 for missed KMK distributions as unsupported by sufficient evidence. We address each challenge in turn, and we conclude that many of Kerry's arguments have merit. We therefore affirm in part and reverse in part, and we remand the case for further proceedings.

## I. The Bell Canyon Expenses

¶22 Kerry first argues that the court abused its discretion by failing to credit him for using his half of the marital estate to pay some of the Bell Canyon expenses, an oversight that he claims has resulted in "Shauna receiv[ing] an oversized share of the marital estate." For the reasons discussed, we agree, at least in part.

¶23 The district court rejected several of Kerry's claims for credit related to Bell Canyon and provided well-grounded reasons for doing so. With regard to these items, we discern no abuse of discretion in the court's decision to reject Kerry's claims. For example, the court rejected Kerry's claim for $203,175 in

---

expenses he paid for from the date of separation until entry of the court's final order, over six years later." But later in his brief, Kerry makes clear that he does not contest the valuation date, and he instead focuses on the court's purported failure to credit Kerry for expenses he paid. Indeed, Kerry states plainly that he "does not challenge the valuation date" of the marital property. Thus, we are not asked to, and we do not, address whether the court abused its discretion by valuing the Investment Account as of the date of separation in 2016. *See Petrzelka v. Goodwin*, 2020 UT App 34, ¶ 47, 461 P.3d 1134 ("While a court should generally value the marital estate at the time of the divorce decree or trial, a court has broad discretion to value the parties' marital assets at a different time, such as that of separation, if it determines that the circumstances so warrant." (cleaned up)).

"labor costs" he allegedly expended on Bell Canyon, explaining that "without evidence to corroborate the actual work expended by [Kerry], and the apparent attempt to charge the marital estate at an absurdly high hourly rate for labor, for among other things, the changing of smoke alarm batteries," Kerry failed to present "credible evidence to meet his burden of proof." And the court similarly rejected a claim for $10,000 in "unrecorded" expenses because "[n]o evidence ha[d] been provided other than [Kerry's] representation to corroborate these expenses."

¶24 But the court found that some of the Bell Canyon expenses—the "completion costs"—*were* legitimate, yet it did not credit Kerry for using his half of the marital estate for these expenses. That was an error, and it produced an inequitable division of property in this case.

¶25 In the Final Order, the court addressed the completion costs for Bell Canyon and explained that Kerry's trial exhibit showing some $172,000 in completion costs was "a more reliable representation of the charges appropriately attributable to completion costs." And the court seems to have validated these expenses in another part of the Final Order, explaining that it would attempt "to allocate against the marital estate some of the expenses for Bell Canyon." Yet the court ultimately rejected Kerry's claim because it found that the "completion costs, whatever they may have accurately been, were paid with marital monies and therefore [were] not an offset against either party."

¶26 The district court was correct in stating that the ultimate source of the funds—the Investment Account—from which the completion costs were paid was marital property, but the court was incorrect in requiring Kerry to effectively pay Shauna half of the value of the Investment Account without first giving Kerry a credit for the Bell Canyon completion costs he paid out of that account. The key to understanding the court's error requires a general tracing of the Investment Account funds. The Investment

Account was deemed marital property, and it was valued at $197,584 at the time of separation. During the litigation, Kerry liquidated the Investment Account and deposited these funds into his personal account. Eventually, Kerry used part of these funds—possibly $172,485—for the costs of completion for Bell Canyon. So, the court was correct that Kerry paid marital expenses (for Bell Canyon) with marital funds (from the Investment Account). But in its Final Order, the court did not accurately account for all of this.

¶27    In the final breakdown of the property division, the court allocated to Shauna her complete half of the Investment Account ($98,792)—the account from which the Bell Canyon completion costs were ultimately paid—without making any deduction for her half of those Bell Canyon completion costs. In doing so, the court effectively burdened Kerry with paying the entirety of those completion costs, which all parties agree were marital expenses. In other words, to achieve an equal division here, Shauna's credit should have been half of whatever amount remained of the Investment Account funds *after* the Bell Canyon completion costs had been deducted.[3] The district court thus erred by ordering

---

3. The court's finding as to the Bell Canyon completion costs was somewhat ambiguous. The court stated that it found "$172,485.23 as the cost of completion of Bell Canyon, which [would] be deducted against the sale price." But in the same section, the court stated that the "completion costs, *whatever they may have accurately been*, were paid with marital monies and therefore [were] not an offset against either party." (Emphasis added.) Thus, on remand, the district court should make an express finding as to the amount of the Bell Canyon completion costs. This amount—whatever it is ultimately found to be on remand—should be subtracted from $197,584, and the parties should then split what remains. Assuming for purposes of illustration that $172,485 is the correct number for the Bell Canyon completion costs, the parties should

(continued…)

Kerry to give Shauna a full half of the Investment Account (valued at separation) when he apparently used most of the Investment Account funds to complete the construction of Bell Canyon, a marital asset.

¶28 Shauna resists this conclusion by arguing that the district court correctly found that Kerry had commingled marital assets—including the Investment Account—with his personal funds and therefore any claim he had for an offset could not be proved. Commingling occurs where "separate property . . . has been mixed in with marital assets to such a degree that it is no longer reasonably possible to distinguish between the separate and marital property." *Thorup v. Thorup*, 2024 UT App 93, ¶ 24, 554 P.3d 329. We have explained that an important part of "any commingling analysis . . . is whether the property in question has retained its separate character," and "this inquiry often turns on whether the property's separate identity can still be traced or accounted for." *Id.* (cleaned up).

¶29 But we agree with Kerry that the concept of commingling is not implicated here. The court expressly found that all the relevant property was marital. And Kerry has not argued—nor did the district court find—that he contributed separate property to the marital estate for which he is entitled to an offset. All the relevant tracing in this case involves marital property only, and therefore the identity of the funds is simply not at issue. And in any event, the amount of the Bell Canyon completion costs is an ascertainable figure that can be traced and computed. We therefore do not find Shauna's invocation of the commingling caselaw to be persuasive.

---

split $25,099, and that split should be effected by requiring Kerry to pay to Shauna half ($12,549.50) of *that* amount instead of half of the full value of the Investment Account.

¶30    We therefore affirm the district court's findings and conclusions regarding many of the Bell Canyon expenses, *see supra* ¶ 23, but we vacate Section 3.C. of the Final Order rejecting Kerry's claim for an offset for the completion costs of Bell Canyon, and we remand this case for further proceedings on this point, including a determination of what those costs actually were and an equitable allocation of the remaining funds from the Investment Account.

## II. The KMK Expenses

¶31    Next, Kerry argues that the district court abused its discretion by failing to credit him for KMK expenses he paid after the 2019 Order, an oversight that he claims also resulted in "Shauna receiv[ing] an oversized share of the marital estate." Specifically, he argues that after the 2019 Order, which split all of the KMK revenue equally without reserving any funds from which to pay KMK's expenses, he was forced to pay any such expenses out of his half of the revenue and that he did not receive credit for paying these expenses. As with the previous section, we agree with some of Kerry's assertions in this regard.

¶32    The district court addressed most of Kerry's claims for credit related to KMK's expenses and provided well-grounded reasons for rejecting those claims. The court reasonably rejected Kerry's claim for a 5% management fee for services provided before the 2019 Order because "[t]here was no agreement between the parties, nor any order of the [c]ourt, . . . for management of KMK until the parties entered into a stipulation in June 2019." The court also appropriately rejected Kerry's claim for a 3% fee on the renegotiation of the KMK lease because "there was no agreement by the parties for such an additional fee to be incurred on top of the fee [Kerry] was already receiving for management of KMK," Kerry was not a "broker, realtor, [or] third party entitled to such a fee," and his claim was "unsupported by any evidence as to time expended or a reasonable rate for such a service." And the court

rejected Kerry's claim to $108,900 as a salary "on the same basis" as the claims discussed above. In short, these claims for credit were squarely addressed in the Final Order, and we discern no abuse of discretion in the court's handling of them.

¶33 However, Kerry asserts that the district court, in the Final Order, failed to address a number of "hard expenses" associated with KMK, and on this point we agree with Kerry.[4] He provides a few examples: commercial insurance of $7,127, "building insurance" of $8,153, and a city bond for $3,808. Instead of addressing whether Kerry had proved that he was entitled to a credit for any hard expenses he may have paid on behalf of KMK after the 2019 Order, the court simply ruled that the parties had "stipulated" to the fifty-fifty revenue split in 2019 and that, therefore, the court would not adjust the accounting accordingly. That was an error.

¶34 Indeed, the court appeared to acknowledge the existence and legitimacy of some of these hard expenses when it addressed the significant disparity between the parties' calculations of KMK's total revenue. The court first explained that Kerry's calculation included deductions for "items such as management fees, property maintenance work (already excluded by the [c]ourt), property management, and legal fees," and as a result, the court concluded that Kerry's evidence was "largely unusable" because "it contain[ed] claims and expenses disallowed by the [c]ourt." In other words, Kerry's calculation mostly included expenses that the court had reasonably rejected, as discussed above. The court then explained that after "[a]dding these fees back into the [net] income," the expenses in Kerry's calculation had been reduced "from $678,272.97 to $171,003.71," a figure that appears to represent legitimate KMK expenses. And as to

---

4. Indeed, Kerry made clear at oral argument before this court that, regarding the KMK expenses, "all [Kerry is] appealing is the actual hard expenses."

Shauna's proposed calculation, the court explained that it "allegedly reflect[ed] total net rental revenue from separation until [the] sale of KMK *but* [*did*] *not account for expenses* poured into Bell Canyon *or KMK*." (Emphasis added.)

¶35 Faced with these competing calculations, the court explained that it was "left with a decision of net rental income for KMK of [Shauna's] $783,482.91 claim and [Kerry's] adjusted claim figure of $507,269.26." And in resolving that disparity, the court decided that it would "not make any adjustment" because "the parties had negotiated and stipulated to a division of the rental income as it came in." While its meaning is not entirely clear, it appears that the court rejected Kerry's claims for a credit for KMK hard expenses because of a purported stipulation.

¶36 But that was not entirely accurate. After the two-day trial in 2019, the parties did indeed stipulate to a $6,000/$6,000 split of the revenue, but that stipulation included a reservation of $3,000 per month to pay KMK expenses; Kerry did not ever stipulate to the 2019 Order provision that split the revenue $7,500/$7,500 with no reserve for expenses. Indeed, Kerry objected, arguing that dividing the revenue this way would harm him because he would then be responsible for covering any KMK expenses with his half of the proceeds. The court responded that "if getting . . . to the bottom line means that KMK is going to go under, then it goes under. And that's the way it is." Because the court did not grapple with the hard expenses Kerry claimed to have paid after the 2019 Order and instead relied on a purported stipulation, we conclude that "there was a misunderstanding or misapplication of the law resulting in substantial and prejudicial error." *Goggin v. Goggin*, 2013 UT 16, ¶ 44, 299 P.3d 1079 (cleaned up).

¶37 Accordingly, while we do not disturb the court's rejection of a number of Kerry's claimed credits for asserted KMK expenses, *see supra* ¶ 32, we vacate the part of the Final Order that assumed Kerry had stipulated to not being given a credit for KMK

hard expenses incurred after the 2019 Order,[5] and we remand this matter to the district court to assess whether Kerry incurred any such expenses that were not expressly rejected in the Final Order and, if he did, for the court to give Kerry credit for such expenses.

### III. The KMK Distributions

¶38    Finally, Kerry challenges—as unsupported by sufficient evidence—part of the district court's credit to Shauna of $60,000 for missing KMK distributions. This challenge is bifurcated into two distinct claims of error, one for crediting Shauna $45,000 (instead of $37,500) in missing distributions from 2020, and the other for crediting Shauna $15,000 (instead of $7,500) for 2021. In summary, Kerry claims that the court made two separate $7,500 errors, one regarding 2020 and one regarding 2021. As discussed below, we reverse regarding 2020 and affirm regarding 2021.

¶39    In this case, the district court credited Shauna a total of $60,000 for missing KMK distributions. This total represented six monthly distributions of $7,500 for 2020 (totaling $45,000) and two for 2021 (totaling $15,000). Yet for 2020, Shauna's and Kerry's trial exhibits are consistent regarding the missing distributions, showing only *five* missing distributions, totaling $37,500. Kerry's exhibits not only match Shauna's total for 2020 but also contain supporting documentation for the seventh distribution in 2020 (July). And the district court stated that, for this finding, it was relying on Shauna's exhibit—which, again, totaled $37,500 in 2020. For these reasons, we have a "definite and firm conviction that a mistake has been made," *Cummings v. Cummings*, 821 P.2d 472, 476 (Utah Ct. App. 1991) (cleaned up), and conclude that this

---

5. Specifically, we reverse the court's determination that an adjustment for expenses was unnecessary because the parties had stipulated to an even split of the revenue, per Section 3.E.v. of the Final Order.

was clear error. Shauna is entitled to only $37,500 in unpaid distributions for 2020.

¶40    It is true that Shauna testified at trial that she had not received $45,000 in rental distributions in 2020, but that testimony is overwhelmingly controverted by the evidence, even by her own trial exhibit. And counsel for Shauna conceded at oral argument before this court that Shauna's trial exhibit reflects that the seventh distribution was in fact made.

¶41    As for 2021, we conclude that the court's findings and conclusions were supported by sufficient evidence. The parties disputed whether Shauna received her distribution for March of that year. Kerry's trial exhibit noted only one missing distribution (for $7,500 total). Yet Shauna testified that she was missing two distributions for 2021 (totaling $15,000), and her trial exhibit supported her claim. The trial record therefore contains evidence sufficient to support the court's finding that Shauna was entitled to $15,000 in distributions for 2021. *See Clarke v. Clarke*, 2023 UT App 160, ¶ 27, 542 P.3d 935 ("[W]here there exists evidence sufficient to support a court's rulings regarding a divorcing couple's finances, that ruling will be upheld on appeal, even if evidence was presented that might have cut the other way.").

¶42    We therefore affirm the court's findings and conclusions regarding 2021—that Shauna did not receive two distributions that year, totaling $15,000. But we reverse the court's credit to Shauna of $45,000 for 2020 distributions, because the evidence is insufficient to support it; with regard to 2020, the evidence supports only a conclusion that Shauna did not receive five distributions that year, totaling $37,500. We therefore remand this matter to the district court with instructions to amend the Final Order on this point.

CONCLUSION

¶43    The district court abused its discretion in this case when it failed to credit Kerry for two specific categories of marital expenses he incurred from his half of the marital estate during the pendency of the divorce litigation. The court also clearly erred when it credited Shauna for a revenue distribution that she had in fact been paid in 2020. These errors resulted in an inequitable division of the marital property, and we vacate and reverse the parts of the Final Order identified above. We affirm the Final Order in all other respects, and we remand this case to the district court for further proceedings, which may or may not—in the court's discretion—require a new evidentiary hearing.

_____